Stoner *v.* Higginson et al., Appellants.

Argued October 4, 1934. Before FRAZER, C. J., SIMP-SON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Maynard Teall,* with him *Reed, Smith, Shaw & McClay,* for appellants.—The service was not a valid service under the Act of April 2, 1856, P. L. 219, or the Act of April 21, 1858, P. L. 403.

The evidence did not admit of any finding other than that the defendants were not engaged in business in Allegheny County when the service was made and the one served was not in their employ at that time.

The Acts of 1856 and 1858 are in violation of Amendment XIV, section 1, of the Constitution of the United States.

A nonresident absent individual does not become amenable to a court in Pennsylvania in an action in personam without service upon him even if he does do business in Pennsylvania through his agents or employees.

Assent to a statutory substituted or constructive service intended to create jurisdiction in personam, when in fact such jurisdiction does not exist, cannot be made a condition of doing business within the State.

Jurisdiction in personam cannot be obtained over a nonresident natural person unless he is personally served or voluntarily appears: Pennoyer v. Neff, 95 U. S. 714; Flexner v. Farson, 248 U. S. 289.

Registration under the Fictitious Names Act of June 28, 1917, P. L. 645, does not operate as a power of attorney for substituted service.

*W. W. Stoner*, of *J. M. Stoner and Sons*, for appellee.

OPINION BY MR. JUSTICE MAXEY, November 26, 1934:

This is an appeal from the order of the court below refusing to set aside the service of a summons in an action of trespass against sixteen defendants, none of whom were Pennsylvania residents, comprising the partnership of Lee, Higginson & Co. This firm maintained offices in New York, Boston and Chicago, and branch offices in other cities including Pittsburgh, where its office was, from July 1, 1930, in charge of a manager named Gilliland. The firm was registered under the Fictitious Names Act of June 28, 1917, P. L. 645, 54 P. S., section 21, the names and residences of all the partners being listed and the fact that Gilliland was the firm's agent in Allegheny County being certified. On June 28, 1932, while this agent was in the Pittsburgh office, a deputy sheriff served him with a summons in a suit in trespass against the firm. The Acts of April 2, 1856, P. L. 219, section 1, and of April 21, 1858, P. L. 403, section 1, assuming them to be valid and assuming Gilliland to be defendants' agent, authorized the service made.[1]

---

[1] The Act of 1856, P. L. 219, section 1, provides as follows: "Where any person or persons, not being residents of this Commonwealth, shall engage in business in any county within the Commonwealth, and not being in the county at the time of the issuing of any writ or process against such person or persons, it shall be lawful for the officer charged with the service thereof to serve any writ of summons, or any other mesne process, in like manner as summons are served upon the agent or clerk of such defendant or defendants at the usual place of business or residence of such agent or clerk, with the same effect as if served upon the principal or principals personally: Provided, that, before final judgment is entered in any case under this act, actual notice in writing shall be given to the party defendant of such action, and the nature thereof; proof of

Counsel for the defendants appeared d. b. e. for the sole purpose of challenging the court's jurisdiction. Defendants filed a petition stating that they were nonresidents, that Gilliland had ceased to be in their employ on and after June 15th, that on that date they had ceased to do business in Allegheny County, that the court was without jurisdiction over them, and that the attempted service was null and void. This petition was unavailing. Hence this appeal.

On June 14, 1932, fourteen days before the service herein attacked, Lee, Higginson & Co. had made the following announcement: "The firm plans to discontinue the issuance and distribution of securities and will, with certain exceptions, withdraw from the deposit business. A corporation to be known as Lee Higginson Corporation, with its capital paid in from sources outside the present partnership, is presently to be formed to engage in the securities business with offices in New York, Boston and Chicago. The assets of Lee, Higginson & Company will remain with the partnership, and following the formation of the new corporation the firm will devote itself to the protection and eventual liquidation of its assets and to the handling of its existing acceptance business." The firm claimed that on June 15, 1932, it closed all of its offices, its purpose being to withdraw from the securities business, except the offices in New York, Boston and Chi-

---

which notice shall be made by the production of a copy of such a notice, and the oath or affirmation of the plaintiff, or other person, to the service thereof, to the magistrate or court before which such action may be pending."

The Act of 1858, P. L. 403, section 1, provides as follows: "When any person or persons, not being residents of the Commonwealth, shall engage in business in any county of this Commonwealth, it shall and may be lawful for the officer charged with the execution of any writ or process issued out of any of the courts of this Commonwealth, to serve the same upon any clerk or agent of such person or persons, at the usual place of business or residence of such agent or clerk, with like effect as though such writ or process was served personally upon the principal."

cago, which were kept open for the purpose of completing pending transactions and protecting assets. It was testified by one of the partners that the managers of the branch offices, including the one in Pittsburgh, were notified, on or before June 15, 1932, that the firm had determined to withdraw from business and instructed them to close the branch offices on June 15, 1932, and to notify the other employees that their employment with the firm terminated on that date. The rent for the office in Pittsburgh was paid until August 29, 1932, when the firm secured the cancellation of its lease. The Pittsburgh manager was paid a salary to June 15, 1932, and then he and the other employees were paid additional amounts equivalent to another one-half month's salary. This was characterized by defendants' witnesses as "extra compensation for lack of preliminary notice of the termination of employment." During the latter part of June, 1932, and the early part of July, 1932, the manager sold furniture which was in the firm's office in Pittsburgh and forwarded to the firm's New York office the checks received therefor.

The court found from the evidence that the office was kept open in Pittsburgh until July 1, 1932, with the names of the defendants on its doors, that the telephone in the defendants' name was not disconnected until July 1, 1932, and that this service from June 15th to July 1, 1932, was paid for by defendants. The court also found that Gilliland not only sold the office furniture for the defendants and remitted the proceeds, after June 15, 1932, but he also collected the licenses of defendants' agents in Pittsburgh and forwarded them to defendants, that he closed two bank accounts of defendants and transmitted the amount to them, and that he shipped to defendants files and records after June 15, 1932, and arranged for the cancellation of the telephone contract as of July 1, 1932. The court also found from the evidence that "to all outward appearances defendants were doing business in Allegheny County on June 28, 1932, as they

had been for years theretofore, and Gilliland was in outward possession of their office as their agent and representative."

The appellants argue that, though subsequent to June 15, 1932, Gilliland sold the office furniture, sent the firm's records to New York, etc., that the firm's name remained on the door of the office, and that the telephone service was not disconnected until July 1, 1932, "that sort of thing was not, we submit, being 'engaged in business' but was merely disposing of equipment and closing the office after the defendants had ceased to be 'engaged in business' in Allegheny County as investment bankers or otherwise." It is true that the firm was not engaged in exactly *the same sort* of business after June 15, 1932, as it had been theretofore, but the evidence amply sustained the finding that the firm was "engaged in business" at the time service was made, i. e., June 28, 1932.

Appellants next contend that "registration under the Fictitious Names Act of June 28, 1917, does not operate as a power of attorney [for Gilliland] for substituted service." Appellants say "that the Fictitious Names Act does not have any reference to service of process and is irrelevant to the issues of this appeal," and "registration under it gives nobody a power of attorney," and that "it is not directed at nonresidents, but at all persons who do business under fictitious names; . . . . . . No provisions of the statute pertain to service of process on either residents or nonresidents."

That this act makes specific reference to nonresident owners in this State is indicated in the second paragraph of section 1 of the act, which reads as follows: "Where any of the owners of said business live *outside of the Commonwealth of Pennsylvania* [italics supplied], and carry on or conduct any such business through an agent, such certificate shall also show the name and address of such agent." The section quoted was amended by the Act of May 10, 1921, P. L. 465, by adding after the words "such agent," "Provided, That the failure of any such

person or persons [i. e., nonresident owners] to file the certificates aforesaid......shall not impair or affect the validity of any contract with such person or persons, and actions or proceedings at law or in equity may be instituted and maintained on any such contract, but no such action shall be instituted or recovery had by any such person or persons on any such contract, either expressed or implied, in any of the courts of this Commonwealth ......until such person or persons comply with the provisions of this act." This was a denial of access to the courts of this Commonwealth by any absentee owners of local businesses until they had, inter alia, designated their agent in this Commonwealth and set forth his address.

In Lamb v. Condon et al., 276 Pa. 544, 120 A. 546, this court said in an opinion by Mr. Justice SADLER, "It is also to be observed, as indicative of the legislative intent, that no prohibition against the bringing of suits by residents of the State, who were in default, was made, but that the inhibition was directed solely to those living beyond the confines of the Commonwealth." This indicates that there was a close relationship between these acts and the processes of our courts.

Without question or protest these defendants duly designated a certain person as their *agent* in this Commonwealth. The American Law Institute in "Restatement of the Law of Agency," volume 1, section 1, page 7, lays down the following definitions of *Agency:* "(1) Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. (2) The one for whom action is to be taken is the principal. (3) The one who is to act is the agent."[2] The term *agent* is custom-

---

[2] In section 3, *General Agent* is defined as "an agent authorized to conduct a series of transactions involving a continuity of service." That Gilliland was the general agent of the defendants in

arily defined as one who has been entrusted with the business of another. Gilliland was the person these defendants said "shall act on their behalf and subject to their control," in Allegheny County, in matters relating to the principals' business. He therefore answers the description of an "agent" upon whom, under the Acts of 1856 and 1858, supra, service was properly had in the suit against these nonresident principals. As their duly selected agent, he was presumably vigilant in guarding their interests, and, being so, would notify the defendants of the summons served upon him. This in fact he did.

The "agent" on whom service may be made effectually does not have to be described as "an attorney in fact," or as a "special agent," or as "an agent on whom process may be served," nor does any of his "authority" have to be expressed. It is sufficient for a valid service under the Acts of 1856 and 1858, supra, that he has the name or character of "agent," in the appropriate territory, of the defendants against whom the writ has been directed. Appellants say it is "doubtful whether they were required to register under the Fictitious Names Act" and that this act has nothing to do with substituted service. The answer to that is that Gilliland would be equally subject to service of this writ, as defendants' agent, even if there had been no designation of him as such under the Fictitious Names Act or if there had been no such act. He was their agent *in fact* when he was served on June 28, 1932. His being registered as such merely facilitates the proof.

The record discloses therefore that appellants, Lee, Higginson & Co., were "doing business" in Allegheny County on the day the summons was served on Gilliland, that they themselves were nonresidents, and Gilliland was at that time their duly designated agent in that ter-

---

Allegheny County is a legitimate inference from the record, but whether he was simply "agent" or "general agent" is immaterial to this issue.

ritory, and that under the laws of this Commonwealth an effective service was made upon *them*, by serving the writ upon him. The return of service shows that the requirements of our nonresident-service acts were fully satisfied.

The practice of serving, in various actions and under specified circumstances, a summons on a person who is designated by the principal as his agent has long been established by statute[3] in this Commonwealth and not the slightest judicial currency has ever been given to the idea—if such has even been advanced—that a judgment against a defendant so summoned to appear and defend was a deprivation of his property otherwise than by

---

[3] The term "agent" is used in the act providing for service upon *residents* of this Commonwealth who are engaged in business "in any other county than the one in which he, she, or they shall reside, and not being in the county at the time of the issuing of such writ or process." The Act of May 4, 1852, P. L. 574, section 1, provides in such case that "it shall be lawful for the officer charged with the service thereof to serve any writ of summons, or any other mesne process upon the agent or clerk of any such defendant, at the usual place of business or residence of such agent or clerk, and to have the same effect as if served upon the principal personally." The Act of July 9, 1901, P. L. 614, section 1, clause 2, and the Act of April 3, 1903, P. L. 139, section 1, provide for the service in personal actions, upon a corporation, a partnership limited, or a joint stock company, in the county wherein it is issued, by one of several methods, among them being the following: "(e) by handing an attested copy thereof, at any of its offices, depots, or places of business, to its agents or persons for the time being in charge thereof, if upon inquiry thereat the residence of one of said officers within the county is not ascertained, or if from any cause an attempt to serve at the residence given has failed." The same acts provide for service on registered foreign corporations, partnerships limited or joint stock companies, "by serving its duly registered attorney as in the case of a summons issued against him personally, or by leaving a true and attested copy thereof for him, at the registered place, if he be not found there during the usual business hours of any business day, *with the person for the time being in charge of the business carried on at such place.*" (Italics supplied.)

"the law of the land" as that equivalent[4] of "due process of law" is used in article I, section 9, of Pennsylvania's Bill of Rights.

The next question is: Did the service of this process on these nonresident defendants by serving their designated agent deprive them of that "due process of law" guaranteed by the Fourteenth Amendment to the United States Constitution as the United States Supreme Court has interpreted that phrase? Appellants contend that it does. Their proposition is that the service was "not good" even if defendants had continued to do business in Allegheny County and Gilliland had continued in their employ to and including the date of service. They argue: "The defendants were nonresidents of the Commonwealth. They were not served with process. A nonresident absent individual does not become amenable to a court in Pennsylvania in an action in personam without service upon him even if he does do business in Pennsylvania through his agents or employees. Our legislature is without constitutional power to enact a statute purporting to place nonresident individuals under the jurisdiction of our courts when such individuals are not served and are geographically beyond the reach of process. Assent to a statutory substituted or constructive service intended to create jurisdiction in personam, when in fact such jurisdiction does not exist, cannot be made a condition of doing business within the State. Nonresident individuals, unlike foreign corporations, are citizens and as such have an absolute right to do business in a lawful manner in every state, and submission to suit in personam without any effectual service of process cannot be compelled by statute."

---

[4] That these phrases have been used interchangeably from ancient times is well settled. In 1368, Edward III was petitioned by the House of Commons that "presentments before his justices be made only by due process according to the ancient law of the land." This petition was granted "because this is an article of the Great Charter."

If appellants mean to invoke "an absolute right to do business" in every state, the answer is that they are invoking something which in the practical affairs of government is nonexistent. All constitutional and statutory rights must be exercised with due regard for the regulations of the sovereign of the place of exercise. Even the so-called "fundamental right" to life, liberty and the pursuit of happiness is not absolute but relative. If appellants mean simply to invoke the right of citizens of other states to do business in this Commonwealth "in a lawful manner," the answer is that that right is unchallenged on this record, but the point is made that they were doing business in this Commonwealth "in a lawful manner" only when they complied with the Fictitious Names Act of 1917 by designating an agent and by here submitting through this agent to the service of judicial process as the laws of this Commonwealth prescribe. We hold that none of these statutes infringe upon the due process clause of the federal Constitution.

"The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states," as section 2 of article IV, of the Constitution declares. This has been interpreted as the right "to pass through, or to reside in any other state for purposes of trade, agriculture, professional pursuits or otherwise."[5] See Ward v. Maryland, 12 Wall. 418, at 430, and Paul v. Virginia, 8 Wall. 168, 180. But this right is no more nearly "absolute" than any other rights guaranteed citizens by the federal Constitution and there are numerous examples of state regulation of federal rights, which regulations have been upheld by the United States Supreme Court. For example, a state cannot lawfully exclude from its domain a corporation which is engaged solely in interstate commerce. But this powerlessness to exclude, does not mean powerlessness to impose fair and reasonable conditions

---

[5] The Fourteenth Amendment declares, inter alia: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

of admission. The United States Supreme Court, in International Harvester Co. v. Kentucky, 234 U. S. 579, while expressly reaffirming the proposition that "a state cannot burden interstate commerce or pass laws which amount to the regulation of such commerce," said, "this is a long way from holding that the ordinary process of the courts may not reach corporations carrying on business within the state which is wholly of an interstate commerce character. Such corporations are within the state, receiving the protection of its laws, and may and often do have large properties located within the state." The Supreme Court in that case upheld the right of Kentucky to require a corporation engaged in purely interstate commerce as a condition of doing business there, to designate an agent upon whom process could be served. It *rejected* as "novel" and without judicial support the proposition that "as long as a foreign corporation engages in interstate commerce only, it is immune from the service of process under the laws of the state in which it is carrying on such business."

In Chicago, Rock Island and Pacific Ry. Co. v. State of Arkansas, 219 U. S. 453, the United States Supreme Court cited with approval the following from the opinion of Mr. Justice MATTHEWS in Sherlock v. Alling, 93 U. S. 99: "Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it within the meaning of the Constitution. ...... And it may be said generally, that the legislation of a state, not directed against commerce or any of its regulations, but relating to the rights, duties and liabilities of its citizens, and only indirectly and remotely affecting the operations of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water, or engaged in commerce, foreign or interstate, or in any other pursuit."

In Continental Baking Co. et al. v. Woodring, Governor, et al., 286 U. S. 352, 365, the Supreme Court of the United States, in an opinion by Chief Justice HUGHES,

upheld the Kansas Motor Vehicle Act as applied to interstate commerce. This act required that motor carriers of property, using public highways of the state, can only do so upon condition that they obtain a license, comply with reasonable regulations, pay a reasonable license fee and a tax for expenses of highway administration and maintenance and reconstruction of the highways covered by the license, and upon the filing of an insurance policy as security against injuries to persons and property other than the passengers and property he carries, caused by the carrier's negligent operation. The Chief Justice said: "Reasonable regulations to that end are valid as to intrastate traffic and, where there is no discrimination against the interstate commerce which may be affected, do not impose an unconstitutional burden upon that commerce."

In Hendrick v. State of Maryland, 235 U. S. 610, the Supreme Court of the United States, in an opinion by Mr. Justice McReynolds, said: "There can be no serious doubt that where a state at its own expense furnishes special facilities for the use of those engaged in commerce, interstate as well as domestic, it may exact compensation therefor. The amount of the charges and the method of collection are primarily for determination by the state itself; and, so long as they are reasonable and are fixed according to some uniform, fair and practical standard, they constitute no burden on interstate commerce."

A state has no more power to exclude arbitrarily from its domain individual citizens who wish to journey therein or to do business there than it has to exclude corporations engaged solely in interstate commerce. Yet it has been held that though a state cannot exclude citizens of other states, it may, without infringing upon the federal Constitution, impose conditions upon admission. That individual citizens of one state who use the highways of another may be compelled by the laws of that other state to "appoint," by their very use of those highways, an offi-

cial of the visited state as their agent or attorney, upon whom process may be served with the same force and effect as though served on them personally, provided actual notice of such service has been received by such citizens, has been expressly decided. In Hess v. Pawloski, 274 U. S. 352, the Supreme Court of the United States held that a Massachusetts statute which declares that the use of the state's highways by a nonresident motorist shall be deemed equivalent to an appointment by him of the registrar [of motor vehicles] as his attorney upon whom process may be served in any action growing out of any accident or collision in which the nonresident may be involved while operating a motor vehicle upon such highways, and which provides for service in such case by leaving a copy of the process and a fee with the registrar or in his office, but conditions the sufficiency of the service upon the sending of notice of it forthwith and a copy of the process to the defendant by registered mail and upon his actually receiving and receipting for the same, and which allows the nonresident when so served such continuances as may be necessary to afford him a reasonable opportunity to defend the action, did not contravene the due process clause of the Fourteenth Amendment. The court declared that this statute "makes no hostile discrimination against nonresidents but tends to put them on the same footing as residents. Literal and precise equality in respect of this matter is not attainable; it is not required. ...... In advance of the operation of a motor vehicle on its highway by a nonresident, the state may require him to appoint one of its officials as his agent on whom process may be served in proceedings growing out of such use."

In Kane v. State of New Jersey, 242 U. S. 160, the Supreme Court of the United States, in an opinion by Mr. Justice BRANDEIS, held that a state may require nonresident owners to appoint a state official as agent upon whom process may be served in legal proceedings brought against them, and resulting from the operation of their

motor vehicles, within the state, citing Hendrick v. Maryland, supra. In this case, Mr. Justice BRANDEIS said: "There is nothing to show that the requirement is unduly burdensome in practice. It is not a discrimination against nonresidents, denying them equal protection of the law. On the contrary, it puts nonresident owners upon an equality with resident owners."

It may be urged that a statutory requirement that visiting motorists automatically designate a state official as their attorney upon whom process may be served is distinguishable from the situation now before us in that it is merely the exercise of the state's police power in the interest of the safety of its citizens. The answer to that is that such requirements are not in their essence *"police regulations"* but *procedural* regulations. A state protects its citizens from reckless motorists *primarily* by penal laws, making the negligent operation of motor vehicles a crime. Penal laws serve the public safety better than civil procedures or regulations, for, in criminal prosecutions growing out of fatal or nonfatal injuries to its inhabitants, the defense of contributory negligence is not available, whereas, in civil suits for damages caused by negligent operation of motor vehicles, contributory negligence is a defense. Laws like the Massachusetts statute and New Jersey statute which were reviewed in the last two cases cited, are designed by the states enacting them to enable their injured citizens to maintain actions *in their own courts* against citizens of other states who, by negligent operation of motor vehicles, inflicted injuries upon them.

Even if we regard such acts, however, exclusively as police regulations, that view of them would not give them a constitutionally preferred status over the Pennsylvania acts now being reviewed. The United States Supreme Court in Sligh v. Kirkwood, Sheriff of Orange County, Florida, 237 U. S. 52, said, in an opinion by Mr. Justice DAY (at page 59) : "At an early day it [the police power] was held to embrace every law or statute which

concerns the whole or any part of the people, whether it related to their rights or duties, whether it respected them as men or citizens of the state, whether in their public or private relations, whether it related to the rights of persons or property of the public or any individual within the state. ...... The police power, in its broadest sense, includes all legislation and almost every function of civil government. ...... It embraces regulations designed to promote public convenience or the general prosperity or welfare, as well as those specifically intended to promote the public safety or the public health."

The essence of appellants' complaint is that they have been denied due process of law. This is based, of course, not on any departure from "due process" in the course of a trial, for as yet there has been no trial; it must be based on departure from "due process" in giving notice to appear and defend. In Holden v. Hardy, 169 U. S. 366, 389, the Supreme Court of the United States, in referring to due process of law, said: "No man shall be condemned in his person or property without due process and an opportunity of being heard in his defense." In the case of Wuchter v. Pizzutti, 276 U. S. 13, which was cited by appellants, it was held that a state statute of New Jersey which provides that in actions by residents of the state against nonresidents for personal injuries resulting from the operation by the latter of their motor vehicles on the state highways, service of summons may be made on the secretary of state, as their agent, and which contains no further provision making it reasonably probable that notice of such service will be communicated to the defendants, was lacking in due process of law, because, as Chief Justice TAFT said in his opinion, "The enforced acceptance of the service of process on a state officer by the defendant would not be fair or due process unless such officer or the plaintiff is required to mail the notice to the defendant, or to advise him, by some written communication, so as to make it reasonably probable that he will re-

ceive actual notice." This case is clearly distinguished from the instant case because here defendants selected their own agent, and it may be fairly presumed that it was his duty to communicate to his principal the fact of service, as he actually did.

In Washington v. Superior Ct., 289 U. S. 361, in which the question raised involved the validity of conditions imposed upon a foreign corporation as a prerequisite to doing business in that state, the United States Supreme Court apparently found *nothing unfair* about a provision which required a foreign corporation to appoint and register a resident agent empowered to accept service of process, etc. In that case Mr. Justice ROBERTS said: "By appointing a new agent when Shaw ceased to be a resident of the state *the appellant could have assured itself of notice of any action."* (Italics supplied.)

Appellants quote from Pennoyer v. Neff, 95 U. S. 714, where service was by publication, the quotation containing, inter alia, the following excerpt: "Process from the tribunals of one state cannot run into another state, and summon parties there domiciled to leave its territory and respond to proceedings against them." This proposition is incontrovertible and we recently expressly recognized and reëmphasized it in our opinion in Atlantic Seaboard Natural Gas Co. v. Whitten, 315 Pa. 529, 173 A. 305. There we also quoted the following from an opinion of the United States Supreme Court in the case of Hollingsworth v. Barbour et al., 4 Peters 466, 474: "No man's right should be prejudiced by the judgment or decree of a court, without an opportunity of defending the right. This opportunity is afforded, or supposed in law to be afforded, by a citation or notice to appear, actually served; or constructively, by pursuing such means as the law may, in special cases, regard as equivalent to personal service." The case now before us is not one of a process of Pennsylvania going into another state; it is a case of process being served *in this State* on a nonresident's local agent, which service under our law is "equiv-

alent to personal service" on the nonresident principal. In the Pennoyer Case, Mr. Justice FIELD said further: "Neither do we mean to assert that a state may not require a nonresident entering into a partnership or association within its limits, or making contracts enforceable there, to appoint an agent or representative in the state to receive service of process and notice in legal proceedings instituted with respect to such partnership, association, or contracts. ......"

Appellants rely on the case of Flexner v. Farson et al., 248 U. S. 289. This was an action brought in Illinois by the plaintiff in error for money upon a judgment rendered by a court in Kentucky. Defendants were doing business in the latter state as partners through Flexner. The defendant Farson was the only one served with a process, and he pleaded that the defendants in the former suit did not reside in Kentucky, were not served with process and did not appear, and that Flexner was not their agent at the time of service upon him, that the Kentucky statute relied upon was unconstitutional, and that the Kentucky court had no jurisdiction and, therefore, its judgment was void. The plaintiff demurred to the pleas and stood upon his demurrer when it was overruled, whereupon judgment was entered for the defendants. The judgment of the court below was affirmed by the United States Supreme Court in an opinion by Mr. Justice HOLMES, who stated: "It is said that the defendants by doing business in the state consented to be bound by the service prescribed. The analogy of suits against insurance companies based upon such service is invoked: Mutual Reserve Fund Life Assn. v. Phelps, 190 U. S. 147. But the consent that is said to be implied in such cases is a mere fiction, founded upon the accepted doctrine that the states could exclude foreign corporations altogether, and therefore could establish this obligation as a condition to letting them in. ...... The state had no power to exclude the defendants and on that ground without going farther the Supreme Court of Illinois rightly held

that the analogy failed, and that the Kentucky judgment was void." We think it was not necessary for the determination of the question of validity of service for the court in that case to decide that the Kentucky act was unconstitutional, because the plaintiff, in demurring to the pleas, admitted that Flexner was not defendants' agent at the time service was made upon him. This alone rendered the service invalid and the judgment a nullity. Secondly, we believe the decision has been in effect overruled in Hess v. Pawloski, 274 U. S. 352. Thirdly, the decision in the Flexner Case did not create a rule of property on which vested interests have since been based; it affected only rules of procedure, and therefore, if public policy[6] requires its reversal, the resulting good has in it no alloy of harm. Appellate courts expressly overrule or modify their former decisions when justice requires it. See Farmers Loan & Trust Co. v. Minnesota, 280 U. S.

---

[6] The eminent jurist who wrote the opinion in the Flexner v. Farson Case, said in his address, "The Path of the Law," Harvard Law Review, volume X, 457: "The language of judicial decision is mainly the language of logic. And the logical method and form flatter that longing for certainty and for repose which is in every human mind. But certainty generally is illusion, and repose is not the destiny of man. Behind the logical form lies a judgment as to the relative worth and importance of competing legislative grounds, often an inarticulate and unconscious judgment, it is true, and yet the very root and nerve of the whole proceeding. You can give any conclusion a logical form. You always can imply a condition in a contract. But why do you imply it? It is because of some belief as to the practice of the community or of a class, or because of some opinion as to policy, or, in short, because of some attitude of yours upon a matter not capable of exact quantitative measurement, and therefore not capable of founding exact logical conclusions. Such matters really are battle grounds where the means do not exist for determinations that shall be good for all time, and where the decision can do no more than embody the preference of a given body in a given time and place. We do not realize how large a part of our law is open to reconsideration upon a slight change in the habit of the public mind."

204;[7] Hall v. D., L. & W. R. R. Co., 270 Pa. 468, 113 A. 669; Lonergan's Est., 303 Pa. 142, 148, 154 A. 387.

Our affirmation of the judgment of the court below is based upon the fact indicated by the evidence and found by the court that "the cause of action arose out of a transaction of their [i. e., defendants'] business in Allegheny County." This decision is without prejudice to the defendants to renew their atack on the service should later proceedings show that the cause of action did not so arise.

Our conclusions are:

First, that the statutes attacked do not abridge the privileges or immunities of citizens of the United States. A citizen of another state has no cause to complain when Pennsylvania imposes the conditions it has imposed on his doing business here, and which are precisely like those imposed on its own citizens. If a resident of another part of Pennsylvania maintained an office and agent in Allegheny County, he could be sued in that county in actions in personam and he would have to respond to the process served on his agent, and defend a suit in that county though it might be hundreds of miles from his place of residence. A nonresident of Allegheny County who happens to reside, for example, in New York State has no more cause to complain of this statute than has a nonresident of Allegheny County who may reside in eastern Pennsylvania only a short distance from the New York State line.

Secondly, that appellants' claim of denial of due process of law is not well founded. In Simon v. Craft, 182

---

[7] Mr. Justice BRANDEIS in his dissenting opinion in State of Washington v. Dawson & Co., 264 U. S. 219, 228, called attention to the fact that the United States Supreme Court in The Genesee Chief, 12 Howard 443, 456, overruled The Thomas Jefferson, 10 Wheaton 428, and The Steamboat Orleans v. Phoebus, 11 Pet. 175. Justice BRANDEIS, in commenting on this overruling said: "A doctrine declared by Mr. Justice STORY with the concurrence of Chief Justice MARSHALL and approved by Chancellor KENT was abandoned when found to be erroneous, although it had been acted on for 26 years."

U. S. 427, 436, the Supreme Court of the United States, in an opinion by Mr. Justice WHITE, said: "The essential elements of due process of law are notice and opportunity to defend. In determining whether such rights were denied we are governed by the substance of things and not by mere form." In Wuchter v. Pizzutti, supra (276 U. S. 13), the Supreme Court of the United States, in an opinion by Mr. Chief Justice TAFT, after discussing several cases involving the question of due service of process, said: "These cases and others indicate a general trend of authority toward sustaining the validity of service of process, if the statutory provisions in themselves indicate that there is reasonable probability that if the statutes are complied with, the defendant will receive actual notice, and that is the principle that we think should apply here."

If, as in Hess v. Pawloski, supra (274 U. S. 352), a service of Massachusetts judicial process can be obtained upon a resident of Pennsylvania in an action for damages arising from an automobile collision in Massachusetts between his car and another car, by serving an official of Massachusetts, without violating the due process of law command of the federal Constitution, we see no reason why a writ issuing out of the Court of Common Pleas of Allegheny County, Pennsylvania, on a cause of action arising in this Commonwealth cannot be served upon residents of New York State by serving their designated agent residing in and doing business for them within the jurisdiction of that court.

The judgment is affirmed.