## Spica *v.* International Ladies Garment Workers' Union, Appellant.

Argued January 15, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, JONES and COHEN, JJ.

*Morris P. Glushien* and *Bernard N. Katz,* with them *M. Herbert Syme,* for appellant.

*Peter P. Liebert, 3rd,* for appellee.

OPINION BY MR. JUSTICE CHIDSEY, March 29, 1957:

The sole but important question presented by this appeal derives from a preliminary objection filed by the defendant International Ladies Garment Workers' Union, hereinafter called the International, that service of process upon the Secretary-Treasurer of the Philadelphia Dress Joint Board, International Ladies Garment Workers' Union, hereinafter called the Joint Board, at the Joint Board Headquarters in Philadelphia, was insufficient to properly bring the International before the Court of Common Pleas of Philadelphia County.

The International is an unincorporated labor union having its main headquarters in New York City. The Joint Board is an aggregation of Local Unions of the International Ladies Garment Workers' Union in the Philadelphia area having its headquarters in a building on North Broad Street in Philadelphia, which building also serves as headquarters for the Local Unions.

Josephine Spica, the plaintiff, brought this action in equity against the International and against William Ross, Business Manager of the Joint Board, alleging that the defendants had wrongfully caused her removal as Business Agent of Local 15, to which office she had been elected in accord with the Constitution and By-Laws of the International. Her removal came after a hearing before the Board of Directors of the Joint Board on July 27, 1954, and was affirmed by the General Executive Board of the International on October 8, 1954.

Service was made by a Philadelphia Deputy Sheriff delivering a copy of the complaint to one Abraham Bloomfield, Secretary-Treasurer of the Joint Board, at the headquarters on North Broad Street in Philadelphia.

Defendants' preliminary objection alleged that the court had no jurisdiction over the International since service of process upon the latter was invalid in that the North Broad Street building is not a place of business of the International, that Mr. Bloomfield is not an officer, employe or agent of the International, and the International neither conducts any business at the North Broad Street building nor has any agents, employes or officers at that location. In support of this objection, depositions were taken of the Assistant Executive Secretary of the International and of Mr. Bloomfield, the Secretary-Treasurer of the Joint Board.

The court below, in an opinion by President Judge LEWIS, held that service upon the International was valid, that the court had jurisdiction, and overruled the preliminary objection. This appeal by the International followed.

The requirements of service upon an unincorporated labor union are prescribed by Pennsylvania Rule of Civil Procedure 2157(a), which reads: "(a) Service of process upon an officer or a registered agent of an association, or upon the manager, clerk or other person for the time being in charge of any place where such association regularly conducts any business or association activity shall be deemed service upon the association, provided that the person served is not a plaintiff in the action.".

It is admitted that Abraham Bloomfield is the Secretary-Treasurer of the Joint Board, and it appears that he is not directly " an officer or a registered agent of" the International, unless it can be said that, for purposes of Pa. R. C. P. 2157(a) he is "an officer" of the International by virtue of his office with the Joint Board. It is unnecessary to so decide if it be found that the International "regularly conducts any

business or association activity" at the North Broad Street office in Philadelphia, for it is not disputed that Mr. Bloomfield upon whom service was made, was "for the time being in charge" of that office. The position taken by appellant is that the general office of the International is in New York City, that it has no office in Philadelphia, nor that there is "any place" in Philadelphia where it "regularly conducts any business or association activity".

An examination of the International's Constitution and By-Laws is most pertinent. The object of the International is set out in Article 1, Section 3 of the Constitution and By-Laws, "The object of the I.L.G.W.U. shall be to obtain and preserve for all workers engaged in the ladies' garment industry just and reasonable conditions of work with respect to wages, work hours and other terms of employment; to secure sanitary surroundings in their places of work and humane treatment on the part of the employers; to aid needy workers in the industry; to cultivate friendly relations between them and generally to improve their material and intellectual standards. Such objects shall be accomplished through negotiations and collective agreements with employers, the presentation, adjustment and settlement of justified grievances of workers against employers, the dissemination of knowledge by means of publications and lecture courses, through concerted efforts to organize the unorganized workers in all branches of the industry and through all other lawful and peaceable means and methods customarily employed by organized workers to maintain or better their standards of life.". The membership of the International "shall consist of individual workers organized in Local Unions in the manner provided in this Constitution", Article 1, Section 4. The Local Unions are chartered by the International, provided

that "(a) The charter and outfit granted to a [Local Union] shall always remain the property of the [International] to be used by the [Local Union] as long as such [Local Union] and its members comply with the Constitution and By-laws of the [International].", Article 1, Section 6. The same article and section further provides that "(c) All funds and other property of [Local Unions] shall be and remain the property of the [International], but may be used by [Local Unions] for their associate purposes so long as they remain affiliated with the [International].".

Article 8, pertaining to membership, states: "Section 7. All members of the [Local Union] are primarily members of the [International] and subject to the orders, rulings and decisions of the [International] and the properly constituted authorities of the same. Section 7-A. By joining the [International], a member irrevocably designates and authorizes the [Local Union] or [Joint Board] or [District Council] to which he belongs, and the [International], to act exclusively as his agent and representative for the presentation, adjustment and settlement of all grievances against his employers and all other matters relating to terms and conditions of employment or arising out of the employer-employee relationship.".

While the supreme governing body of the International is the triennial convention, the effective interim control lies with the General Executive Board, under whose direction the President acts. Its authority is set forth in Article 4: "Section 3. The [General Executive Board] shall have general supervision over all the affairs of the [International] and shall have power to authorize strikes in accordance with this Constitution, issue charters, reprove and punish subordinate locals for violations of this Constitution or for misconduct; to take charge of and to supervise the elec-

388

tions of local unions and joint boards or district councils, or to determine disputes in connection with the arrangement or contents of the ballot for any such election, and to designate or appoint any person or committee for that purpose, such person or committee to supersede the Election and Objection Committee of the [Local Union], [Joint Board] or [District Council]; in cases of emergency, to designate or appoint any person or committee to take over and administer the affairs of any local union, joint board or district council; adopt regulations not inconsistent with this Constitution for the government of the [International] and alter, amend or repeal the same; establish, print and supply all charters, constitutions, official receipts, books of accounts for the [Local Unions], withdrawal cards, transfer cards and traveling cards for all local unions of the [International]; levy such assessments for necessary revenue, as provided in this Constitution, and do all things necessary to promote the welfare of the [International]. It shall have the power to suspend or revoke charters or to reorganize [Local Unions] found guilty of violating any provisions of this Constitution, or of failure to comply with the order of the [General Executive Board], orders or decisions adopted in convention or by referendum vote. The [General Executive Board] shall also have the power to adjust disputes between employers and employees and to make contracts with employers. It shall decide all questions involving the interpretation of this Constitution and all points of law arising under the jurisdiction of the [International] and shall also pass upon all claims, grievances and appeals from the decisions of subordinate organizations in the manner provided by this Constitution.[1]  All decisions rendered

---

[1] It is to be noted that in the instant case an appeal was taken to the General Executive Board under this provision, which upheld the Joint Board's removal of the plaintiff.

by the [General Executive Board] shall be binding on the subordinate locals and the members and must be complied with. Any local or member feeling aggrieved by a decision may, after complying with the same, appeal from it to the next regular or special convention of the [International]. The [General Executive Board] may issue referenda to the members of the [International] on any question whenever it may find it necessary. The [General Executive Board] may, in case of emergency and on request of a [Local Union, Joint Board or District Council], order or direct a special election of officers to be held in such [Local Union, Joint Board or District Council]. . . .". It should be noted that "emergency" is not anywhere defined in the Constitution, and, presumably, the General Executive Board makes this determination under its power to decide questions involving the interpretation of the International's Constitution.

As to Joint Boards, the Constitution of the International, Article 6, Section 1 *directs* that a Joint Board *shall* be organized, "Whenever there are two or more [Local Unions] located in the same city or locality and engaged in various branches of the same trade, . . .". "The main object of the [Joint Board] shall be to attend to, present, adjust and settle justified grievances and complaints of members against employers, to supervise and control union shops, to organize non-union shops and to see to it that harmony prevails among the [Local Unions] affiliated with it. Adjustments by the [Joint Boards] of disputes with or grievances against employers shall be binding upon [Local Unions], and upon such individual members as may be involved. Where such [Joint Boards] exist, they shall have the sole power[2] to make collective agree-

---

[2] In view of the general declaration and reservation of powers by the International, this provision granting the Joint Board "sole

ments in the industry over which they have jurisdiction.", Constitution, Article 6, Section 6. The powers of the Joint Boards are carefully laid out in the International's Constitution. Joint Boards have the power to adopt by-laws, but only with the approval of the General Executive Board. They have the power to discipline their membership and officers, with appeals to the General Executive Board. Local Unions ". . . affiliated with a [Joint Board] . . . *shall* submit all disputes with employers to their [Joint Board] . . . before declaring a strike. The [General Executive Board], however, may demand that it be consulted by the [Joint Board] . . . Controversies which may lead to a strike involving two-thirds (2/3) of the industry in a locality must in any event be first reported to the [General Executive Board]. The [General Executive Board] may veto any proposed strike and such veto shall be binding and conclusive. Whenever any craft is involved in a strike or lockout, the [General Executive Board] shall have the power to order a strike in such other crafts in the same industry as it may deem necessary in order to assist the members on strike.", Article 7, Section 2. The Joint Boards have financial powers regarding assessments, investments, bank accounts, etc., but "(e) All funds and other property of [Joint Boards] and [District Councils] shall be and remain the property of the [International], but may be used by the [Joint Boards] and [District Councils] for their associate purposes so long as they remain affiliated with the [International].", Article 6, Section 3.

Any separate Death Benefit Funds appear to have been abolished by the Constitution as of July 1, 1953,

---

power" is evidently designed to prevent a Local from independently making a collective bargaining agreement with employers where a Joint Board exists.

and there is now permitted only the single Death Benefit Fund of the International. Locals are prohibited from giving any such benefits on their own. As to health, welfare, retirement and vacation funds, while they may be administered locally, they are under the supervision of the International.

Looking at the organization as a whole, as the picture emerges from its constitution, we find an association wherein the ultimate power in terms of membership, officers, grievances, disputes and contracts with employers, and finances lies with the General Executive Board, the governing organ of the International, and where a direct supervision is exercised by the General Executive Board over vital contemporary labor functions such as monetary benefits and general strikes. All monies and property ultimately belong to the International. While many of the functions and purposes of the International are effectuated through Joint Boards, it seems clear that when the Joint Board functions, it does so under the direction and control of the International, and in order to effectuate the objects of the International,[3] not for some self-made or

[3] The tendency in many labor organizations to centralize power in the International was the subject of comment in *Grand Lodge of the Brotherhood of Railway and Steamship Clerks v. Girard Lodge No. 100*, 384 Pa. 248, wherein Mr. Justice MUSMANNO pointed out in penetrating fashion, at p. 265: ". . . A union local has no more power than that assigned to it by the parent body of which it is a part. It is not like a State in the United States which has inherent powers and retains all authority not delegated to the central government. In a labor union the central body is the custodian of the reservoir of power which it channels into the locals in such manner and according to such methods as will best serve the entire organization. That power may be shut off when it is abused by a local (under the constitution and laws which it has agreed to obey) and especially when that abuse may jeopardize the standing, prestige and efficacy of the central body. No far-flung organization, whether it be in the fields of labor, military, industrial or commer-

self-generating purpose. It is of significance that the Philadelphia Dress Joint Board has no Constitution and By-Laws of its own, but functions under that of the International.

The testimony of the Assistant Executive Secretary of the International and of the Secretary-Treasurer of the Joint Board, while denying that the International "transacts business" in Philadelphia, makes clear that the above described picture is accurate.

The name of the International is displayed across the entire front of the North Broad Street building in large silver letters, whereas the name of the Joint Board appears only on the door; the dues cards carried by the individual members carry the signature of the President of the International and are styled "Official Dues Card of the International Ladies' Garment Workers' Union, affiliated with A. F. of L."; the letterhead of the Joint Board bears the official seal of the International and is headed "Philadelphia Dress Joint Board, International Ladies' Garment Workers' Union, American Federation of Labor"; and it appears that organizing activities carried on by agents of the Joint Board have been carried on either in the name of the Joint Board or in the name of the International, or both, in the discretion of the organizer. At least one collective bargaining agreement negotiated between the Joint Board and an employer bore the signature of Mr. David Dubinsky, President of the International, though it is denied that this was the standard practice.

A Mr. Ross is currently the Manager of the Joint

---

cial, can achieve its objectives without intelligent direction which is obediently followed by its integral parts. If every local component of a labor union had the right to go its own way, the union would eventually become a disconnected centipede with legs proceeding in a hundred different directions.".

Board. His predecessor as Manager was Mr. Samuel Otto, who, at the same time, was a Vice President of the International. Mr. Otto left as Manager in Philadelphia at the "request" of the President of the International to accept the directorship of the South Pacific territory of the International on the West Coast. To fill his place, the Philadelphia Dress Joint Board requested Mr. Dubinsky [President of the International] to send a replacement for Mr. Otto. This the President of the International did in the person of Mr. Ross, who was brought in from outside of the Philadelphia area.

In *Stoner v. Higginson et al.,* 316 Pa. 481, 175 A. 527, wherein we affirmed the constitutionality of two statutes which provided for service upon non-resident individuals doing business in Pennsylvania, we quoted from *Simon v. Craft,* 182 U. S. 427, at p. 436 of which the Supreme Court of the United States said: ". . . The essential elements of due process of law are notice and opportunity to defend. In determining whether such rights were denied we are governed by the substance of things and not by mere form. . . .".

Parenthetically, we may point out that *Stoner v. Higginson,* supra, was relied on almost exclusively by this Court in *Quinn v. Pershing (et al.),* 367 Pa. 426, 80 A. 2d 712, which affirmed the constitutionality of Pa. R. C. P. 2157 as it applied to service of process upon the International Fur and Leather Workers Union of the United States and Canada, by service upon its "District Manager" who was held to be an official of that International Union and also a "person for the time being in charge of any place where such association regularly conducts any business or association activity".

The Restatement, Conflict of Laws, §75, supports the test quoted from *Simon v. Craft,* supra, as follows:

"A state cannot exercise through its courts judicial jurisdiction over a person, although he is subject to the jurisdiction of the state, unless a method of notification is employed which is reasonably calculated to give him knowledge of the attempted exercise of jurisdiction and an opportunity to be heard.".

In the instant case the record and the Constitution of the International make manifest that a very constant stream of communication was carried on between the North Broad Street office and the offices in New York City, even if it be assumed arguendo that the Philadelphia office was not in fact an office of the International.

A per capita tax and payments to the Death Benefit Fund are regularly collected by the North Broad Street office and transmitted to the New York office. Auditors selected and employed by the New York office regularly audit the books of the Health and Welfare Funds in Philadelphia. Membership cards are printed by the New York office and, presumably, they are distributed in Philadelphia in accordance with the statements which the Constitution requires be furnished the General Secretary-Treasurer of the International each month. There is evidence of a telegram sent by the New York office directing that a strike in Philadelphia be terminated because it was in violation of a contract. The inference is inescapable that in this instance at least there was necessarily extensive communication with the New York office informing it not only of strike activities but of the contents of local employer-employe contracts in the Philadelphia area. A contract between the Philadelphia Waist and Dress Manufacturers' Association, the International Ladies Garment Workers' Union, and the Joint Board of Waist and Dress Makers' Union of Philadelphia was received in evidence, and it bears the signature, not

only of the former manager of the Joint Board, but also that of David Dubinsky, President of the International.

We are convinced beyond any doubt, therefore, that the contact between the Philadelphia office and the headquarters of the International in New York City was such as to reasonably assure that there was due notice of a judicial proceeding in the instant case.

Nor can there be any question as to the opportunity of the defendant International to be heard in our courts. We are aware of no bar to its appearance before a court in this State. The distances involved are not great. And its appearance here de bene esse, and at the depositions and hearings in the court below, convince us that it has sufficient opportunity to be heard.

The cases in other jurisdictions, and often within the same jurisdiction, are irreconcilably split, and, while they are instructive, it is evident that each case has been decided on its own merits.

In our Federal Courts of Appeals we are aware of only one case where, in an attempt to bring an International Union into a court, service was made, as in the instant case, at a level in the union hierarchy above the Local Union but not at the main headquarters of the International Union. In *Claycraft Co. v. United Mine Workers of America*, 204 F. 2d 600 (C. of A., 6th, 1953), service of process was made upon the director of Region 34 of District 50 of the United Mine Workers of America. After a thorough examination of the relationship between the District and the International Union, and of this regional director's place within the structure, the Court of Appeals held that by virtue of his reports to the International Union it would be ". . . reasonable to infer . . . that service of process on him . . . will be brought home to the union . . .", and

constituted sufficient service upon the International.

As to service of process made at the Local Union level, the United States Court of Appeals for the District of Columbia had occasion to consider this related question in *Operative Plasterers' and Cement Finishers' International Ass'n of the United States and Canada v. Case,* 93 F. 2d 56 (C. of A., D. C., 1937), where Case, a former member who had procured a judgment against the International Association in North Carolina because of alleged wrongdoings against him by the Union, was suing upon that judgment in the District of Columbia. The International Association contended that service of process in the North Carolina suit upon the Secretary-Treasurer of Local Union No. 176 was not proper service against the International Association. The Court examined the duties of the Secretary-Treasurer of the Local Union toward the International Association. It found that the secretary was requested to forward information about membership and apprenticeship, furnish information concerning local finances on forms furnished by the International Association, perform certain functions for the International concerning members who travel or work temporarily in the local area, furnish certain information for strike fund and death benefit purposes, give information and perform duties for the International Association in connection with the imposition of fines by the Local Union, collect and transmit dues for the International Association and that for failure to perform these functions, the International Association could fine the Local Union and remove the secretary. The Court of Appeals upheld the judgment, finding that the summons in the North Carolina suit was valid, having been served ". . . upon 'any agent or representative of the association whose character in relation to the association is such that it could be reasonably ex-

pected that he would give notice of the suit to his association.' . . .".

It will be noted that the duties and penalties imposed by the International Association and considered by the Court in the *Operative Plasterers'* case are very like those imposed on Local Unions and Joint Boards by the Constitution and By-Laws of the International Ladies Garment Workers' Union.

The only other case before a Federal Court of Appeals dealing with this precise question which has come to our attention is *National Organization Masters, Mates and Pilots of America, Inc. v. Banks,* 196 F. 2d 428 (C. of A., 5th, 1952). Process in a suit against the National Association was served upon one Angerholzer. The Court found that Angerholzer's primary occupation was as a self-employed Shipping Master, which is an occupation similar to an employment agency. He was also employed by the State of Florida as a Deputy Harbor Master, and further by Local No. 24 of the aforenamed association at $50 per month to help place the Local's members aboard ships. While he occasionally collected dues for the Local from members whom he placed, he had never been an official or even a member of the Local or of the National Association, nor was he eligible for such membership, and shortly after service of process in this case he was discharged from his employment by the Local because of dissatisfaction in the way he had been placing its members. It may be noted that he placed both union and non-union men in available jobs. The Court of Appeals held that service upon Angerholzer was invalid since he was not responsible to the National Association and there was no reasonable assurance that notice would ever be delivered to the defendants. A mere recitation of the facts makes it unnecessary to further distinguish that case.

There are a number of Federal District Court decisions on this question, but they are far from uniform, each going off on its own facts.

In *Farnsworth & Chambers Co., Inc. v. Sheet Metal Workers International Association, Local 49, and Sheet Metal Workers International Association,* 125 F. Supp. 830 (D. C., New Mexico, 1954), the District Court held that service upon the Business Agent and Financial Secretary of the Local was insufficient as against the International Union. It may be noted that, while similar on its operative facts, this decision did not even refer to the Federal Court of Appeals' decision in the *Operative Plasterers'* case, supra. The decision, moreover, makes clear that it is based on the particular makeup of the union in question: "The Court is of the ultimate opinion that from the way that Local 49 operates and functions, it is an autonomous body, separate and distinct from the International Association, so separated that service of process upon Brooks, the business representative of Local 49, is not valid service of process upon the International Association.". In *Underwood v. Maloney et al.,* 14 F. R. D. 222 (D. C., E. D. Pa., 1953), the Court found that service of process against the International was sufficient when made upon a person named by the President of the International to supervise the affairs of the Local and who was performing the functions of President of the Local. *Pascale et al. v. Emery et al.,* 95 F. Supp. 147 (D. C., Mass., 1951), held service sufficient when made upon a business agent of the Local who was also District President and member of the International's administrative committee. Service upon the President of the Local was held insufficient to hold the International in *Dailey Review Corporation v. International Typographical Union et al.,* 9 F. R. D. 295 (D. C., E. D. N. Y., 1949); and *Dean v. International Long-*

*shoremen's Ass'n et al.,* 17 F. Supp. 748 (D. C., W. D. La., 1936); as was service upon the chairman of the Local, *Christian v. International Ass'n of Machinists et al.,* 7 F. 2d 481 (D. C., E. D. Ky., 1925); upon the General Chairman of a General Grievance Committee, *Kelley v. Brotherhood of Railroad Trainmen,* 90 F. Supp. 925 (D. C., W. D. Mo., 1950); upon the Secretary-Treasurer of the Local, *Singleton et al. v. Order of Railway Conductors of America et al.,* 9 F. Supp. 417 (D. C., S. D. Ill., 1935); and upon the Assistant Business Manager of the Local, *Isbrandtsen Co., Inc. v. National Marine Engineers' Beneficial Ass'n.,* 9 F. R. D. 541 (D. C., S. D. N. Y., 1949).

The decisions of our sister States have for the most part held that service effectuated within the State upon one whose relationship to the International was such that it would be reasonable to expect that notice would reach the International, was valid whether the one served be a person designated by the International to engage in organizational activity in a local area or if he be merely an official of the Local.

In *Bowers v. Grand International Brotherhood of Locomotive Engineers,* 187 Minn. 626, 246 N. W. 362 (S. Ct. Minn., 1933), the Supreme Court of Minnesota held service valid against the International Union when made upon the "Chief Engineer" of the "Division" (the "Division" being the name for a local lodge, and the "Chief Engineer" being its head). Service on the Local Chairman of the Local Committee of Adjustment was held sufficient service on the International in *Edgar v. Southern Ry. Co. et al.,* 213 So. Car. 445, 49 S. E. 2d 841 (S. Ct. So. Car., 1948). The Court of Appeals of Kentucky held service upon an agent of the Local sufficient to bring the International Union before the court in *International Union of Operating Engineers et al. v. J. A. Jones Const. Co. et al.,* 240 S. W. 2d

49 (Ct. of App. Ky., 1951). And in *Brotherhood of Railroad Trainmen v. Agnew,* 170 Miss. 604, 155 So. 205, (S. Ct. Miss., 1934), service upon the Secretary of the Local Lodge was held sufficient to bind the International Union. See also *International Typographical Union v. Ormerod et al.,* 59 So. 2d 534 (S. Ct. Fla., 1952), where service was held sufficient to hold the foreign International when made within the State upon the ". . . Representative business agent, manager and person in charge of the business of such labor organization. . . .".

Service upon organizers working in a local area was held sufficient to bring the International into court in *Schluter v. Trentonian Pub. Co.,* 4 N. J. Super. 294, 67 A. 2d 189 (Superior Ct., N. J., App. Div., 1949); and *Local No. 1226, International Longshoremen's Ass'n v. Ross et al.,* 180 La. 293, 156 So. 357 (S. Ct. La., 1934); and in *Ex parte Milner et al.,* 250 Ala. 511, 35 So. 2d 169 (S. Ct. Ala., 1948), service upon the State Director of the Southern Organizing Committee was held valid against the entire C. I. O. Service upon a Regional Vice-President and representative to the International Executive Board, *Donahue v. Kenney et al.,* 327 Mass. 409, 99 N. E. 2d 155 (Supreme Judicial Ct., Mass., 1951); upon a Secretary-Treasurer of the Local who was also Sixth Vice-President of the International, *Bayci v. Rango,* 304 Ill. App. 203, 25 N. E. 2d 1015 (App. Ct. Ill., 1940); and upon a first General Vice-President of the International, *Biller et al. v. Egan et al.,* 290 Ill. App. 219, 8 N. E. 2d 205 (App. Ct. Ill., 1937), were all held valid even though the main headquarters of the International was in another State, and the greater part of the activities of the person served was on the local level.

On the other hand service was held invalid when made upon the President of the Local in *Thomas B.*

*Hanley v. Sheet Metal Workers International Association,* 293 P. 2d 544 (S. Ct. Nev., 1956), and in *McFarland v. Brotherhood of Locomotive Firemen and Enginemen et al.,* 193 La. 337, 190 So. 573 (S. Ct. La., 1939), but in both cases the courts found that the actions arose out of matters wholly outside the jurisdiction of the Locals. Service upon the business agent of a Local was found insufficient in *United Brotherhood of Carpenters and Joiners of America v. McMurtrey,* 179 Okla. 575, 66 P. 2d 1051 (S. Ct. Okla., 1937), on the technical ground that there was no showing that the person served was actually a member of the Local or International union sought as a defendant. And substituted service upon the Secretary of State under a North Carolina statute was held ineffectual for want of a showing that the International was "doing business" within the State, *Stafford v. Wood et al.,* 234 N. C. 622, 68 S. E. 2d 268 (S. Ct. N. C., 1951). See also *Amon et al. v. Moreschi et al.,* 296 N. Y. 395, 73 N. E. 2d 716 (Ct. of App. N. Y., 1947), and *In the Matter of the Petition of the Western Union Telegraph Company to stay arbitration demanded by the Commercial Telegraphers' Union, A. F. of L.,* 206 Misc. 561, 133 N. Y. S. 2d 371 (S. Ct. N. Y., 1954).

We now turn more specifically to the question of whether the defendant International was "doing business" within this Commonwealth so as to perfect the jurisdiction of our courts. The Restatement of Conflict of Laws, §86, sets down the rule: "(1) A partnership or other unincorporated association, by doing business in a state in which the partnership or association is subject to suit in the firm name, subjects itself to the jurisdiction of the state as to causes of action arising out of the business there done.".

We have made unincorporated associations "subject to suit" in Pennsylvania through Pa. R. C. P.

2157; and see *Quinn v. Pershing,* supra, which affirmed the applicability of that rule to labor unions. And in *Stoner v. Higginson et al.,* supra, we discussed the breadth of the term "doing business" and held that, for jurisdictional purposes, the term was broad enough to apply to a foreign corporation which had been "doing business" in Pennsylvania, and which, at the time of service, was merely closing up its former office and disposing of its equipment. We held that though this latter activity was not the same sort of "business", in light of the evidence as a whole, the firm was amenable to service.

The only case in this Court in which this question arose as to a labor union was in *Quinn v. Pershing,* supra, where, though the evidence was scanty, it appears that union activities were being carried on in a regional office in Pennsylvania. We held the International Union amenable to service under the authority of the *Stoner v. Higginson* case, saying: ". . . That decision and the reasons given govern this case. While perhaps technically a labor union cannot be said to carry on 'business', there is no substantial difference between the business carried on by a nonresident individual in Pennsylvania and the organizational activities carried on by a nonresident unincorporated association in this state. The cause of action arose from those activities carried on by defendant in this Commonwealth. . . .".

The Restatement, Conflict of Laws, in its comment on "doing business" states, §167: "a. What constitutes 'doing business.' Doing business is doing a series of similar acts for the purpose of thereby realizing pecuniary benefit, or otherwise accomplishing an object, or doing a single act for such purpose with the intention of thereby initiating a series of such acts.". One of the illustrations therein noted is particularly appro-

priate to the instant case: "11. A is chartered as a corporation in state X to conduct a patriotic, secret, social and benevolent order. Its agents organize local bodies of members in state Y, a portion of the dues of each member going to organizing officials, another portion to the treasury of the corporation. The paraphernalia of members is obtained from the corporation. A is doing business in Y."

The contacts necessary to hold an International Union, with main headquarters elsewhere, amenable to the jurisdiction of a particular court has been discussed in almost all of the cases cited earlier in connection with our discussion of the propriety of service on particular individuals.

The appellant, and, indeed many of the courts in cases holding that a particular union was not "doing business" within a jurisdiction, place reliance on the holding in *United Mine Workers of America et al. v. Coronado Coal Company et al.,* 259 U. S. 344, that International Unions and their local organizations are "separate entities".[4] It is important to note in what sense Mr. Chief Justice TAFT was using this concept. Early in his opinion he asked the question (p. 383): ". . . Were the unincorporated associations, the International Union, District No. 21, and the local unions suable in their names . . .". And then, in a masterful recognition of the evolving social and economic character of the labor movement, the Court held that they were liable to suit. ". . . Undoubtedly at common law, an unincorporated association of persons was not rec-

---

[4] See *Christian v. International Ass'n of Machinists et al.,* supra; *Dean v. International Longshoremen's Ass'n et al.,* supra; *Daily Review Corporation v. International Typographical Union et al.,* 9 F. R. D. 295, (D. C., E. D. N. Y., 1949); and *Isbrandtsen Co., Inc. v. National Marine Engineers' Beneficial Ass'n.,* 9 F. R. D. 541 (D. C., S. D. N. Y., 1949).

ognized as having any other character than a partner-
ship in whatever was done, and it could only sue or be
sued in the names of its members, and their liability
had to be enforced against each member . . . But the
growth and necessities of these great labor organiza-
tions have brought affirmative legal recognition of
their existence and usefulness and provisions for their
protection, which their members have found neces-
sary . . . It would be unfortunate if an organization
with as great power as this International Union has
in the raising of large funds and in directing the con-
duct of four hundred thousand members in carrying
on, in a wide territory, industrial controversies and
strikes, out of which so much unlawful injury to pri-
vate rights is possible, could assemble its assets to be
used therein free from liability for injuries by torts
committed in course of such strikes. To remand per-
sons injured to a suit against each of the 400,000 mem-
bers to recover damages and to levy on his share of
the strike fund, would be to leave them remediless.".

It is clear that the language of the United States
Supreme Court, in part above quoted, has for its pur-
pose the *broadening of jurisdiction to bring into court*
labor unions at their various levels of organizational
activity and to make their funds and organizational
personalities subject to suit at whatever levels are ap-
propriate to the particular cause of action.

The opinion of the Court in *Coronado* then goes on
(p. 393) : ". . . The next question is whether the Inter-
national Union was shown by any substantial evidence
to have initiated, participated in or ratified the inter-
ference with plaintiffs' business . . .". And this ques-
tion is answered thus, at p. 395: ". . . The strike was
a local strike declared by the president and officers
of the District Organization . . . There is nothing to
show that the International Board ever authorized it,

took any part in preparation for it or in its maintenance. Nor did they or their organization ratify it[5] . . . The argument of counsel for the plaintiffs is that because the National body had authority to discipline District organizations, to make local strikes its own and to pay their cost, if it deemed it wise, the duty was thrust on it when it knew a local strike was on, to superintend it and prevent its becoming lawless at its peril. We do not conceive that such responsibility is imposed on the National body. A corporation is responsible for the wrongs committed by its agents in the course of its business, and this principle is enforced against the contention that torts are *ultra vires* of the corporation. But it must be shown that it is in the business of the corporation. Surely no stricter rule can be enforced against an unincorporated organization like this. Here it is not a question of contract or of holding out an appearance of authority on which some third person acts. It is a mere question of actual agency which the constitutions of the two bodies settle conclusively. If the International body had interfered or if it had assumed liability by ratification, different questions would have arisen.".

To paraphrase, what the United States Supreme Court apparently was saying is this: You may bring the various organizational levels of a labor union into this Court, but before we shall convict any of the entities of tort, you must convince us of its own tortious conduct. The issue decided in *Coronado* was not whether the International Union, District 21, or the Local Unions, all of whom were joined as defendants, were properly before the court as the result of valid service of process, but was whether the defendants or any

---

[5] It may be noted in passing that, as appears in our Footnote 1, supra, in the instant case the International ratified on appeal the action of the Joint Board.

of them was guilty of actionable conspiracy. In the case at bar we are only concerned with the propriety of bringing the International Ladies Garment Workers' Union into court. The question of its alleged wrongful conduct would have to be settled at a trial upon the facts.

A good number of cases have concerned themselves with what activities of an international labor union are sufficient to confer jurisdiction on a particular court.

In *Ex parte Milner*, supra, the fact that the local Organization Committee was trying to effectuate the general purposes of the Congress of Industrial Organizations was considered sufficient to confer jurisdiction. And similar considerations were apparently persuasive concerning District 50 of the U. M. W. in *Claycraft Co. v. United Mine Workers of America*, supra. In *Moran v. International Alliance of Theatrical Stage Employees & Moving Picture Machine Operators et al.*, 139 N. J. Eq. 561, 52 A. 2d 531 (Ct. of Chanc. N. J., 147), it was said that ". . . an association which grants rights and imposes duties on its individual members wherever located and which claims every state of the Union as its field of operation through the establishment in those states of component parts of its organization, by which units or agencies it engages in activities designed to further the objects for which it was organized, which objects can be achieved only through the operation of its units, should be regarded as voluntarily submitting itself to the jurisdiction of those states when duly served with process and should not be permitted to say that it is amenable only to the courts of the state in which it maintains its headquarters.". Picketing was considered a sufficient local activity to confer jurisdiction in *Newark International Baseball Club, Inc. v. Theatrical Managers, Agents*

*and Treasurers Union et al.*, 125 N. J. Eq. 575, 7 A. 2d 170 (Ct. of Chanc., N. J., 1939), (though service was invalid on other grounds). See also *Underwood v. Maloney*, supra, where the General Executive Board and the President of the International exercised supervisory powers over the Local, and *Local No. 1226, International Longshoremen's Ass'n v. Ross et al.*, supra, where the President of the International revoked a Local's charter and sent a worker into the local area to organize new branches.

The pension activities of an international union within a state were considered determinative in conferring jurisdiction on the local court in *Brotherhood of Railroad Trainmen v. Agnew*, supra. See also *Bayci v. Rango*, supra, as to death benefits, and *Bowers v. Grand International Brotherhood of Locomotive Engineers*, supra, as to local investments from union and pension funds.

But certainly the most persuasive cases are those which delve into the relationship of the Local to the International Union by a detailed analysis of the constitutional structure and of the past activities of the units. The Court of Appeals of Kentucky did this in *International Union of Operating Engineers et al. v. J. A. Jones Const. Co. et al.*, supra, as did the Supreme Court of South Carolina in *Edgar v. Southern Ry. Co. et al.*, supra. While we shall not discuss the cases in detail, it is significant to note the facts the courts found persuasive. In the *Operating Engineers* case there was no independent membership in the International Union apart from membership in the Locals (with certain isolated exceptions); there was a common constitution; while the Locals had certain rights of organization and administration, the International had ultimate supervision; Local charters were granted by the International, and were subject to revocation

or suspension; upon revocation of the charter, all funds and property reverted to the International; members were obliged to pledge obedience to the constitution, laws, decisions, etc., of the International; per capita taxes and initiation fees were paid to the International through the Local; elected officers of the Locals were subject to the discipline of the International; the administration of the Local could be taken over by the International; agreements were subject to approval by the General President; strikes were subject to control by the International; and death benefits were paid by the International. The court concluded that ". . . the Local Union is the International Union itself in action . . .".

The *Edgar v. Southern Ry Co.* case contains a similar review of the inter-relationship between the Local and the International, and concludes, "The defendant Order, when it, through its agents, solicits membership in this State in its association, collects dues from its members in this state, sets up its committees for adjustment of dispute between its members and their employer, issues contracts of insurance to its members, and in all other respects prosecutes its activities in this State as a labor union, is doing business within this State so as to subject it to the jurisdiction of the Courts of this State.". Similar considerations are involved in *Schluter v. Trentonian Pub. Co.,* supra, with the notation of an additional contact in that the International examines the books and records of the Local Unions. The *Operative Plasterers'* case, supra, is to similar effect.

A careful review of the record in the instant case convinces us that almost every criterion set down in the foregoing decisions is present, or potentially present, in the relationship here under examination, and that the ILGWU was effectively functioning in the

Philadelphia area through the North Broad Street office so as to constitute that location a place where it regularly conducted "business or association activity" sufficient to make it amenable to service of process under Pa. R. C. P. 2157(a).

We are not in accord with the determinations by some of the Federal trial courts in cases such as *Farnsworth & Chambers Co., Inc. v. Sheet Metal Workers International Association, Local 49, and Sheet Metal Workers International Association,* supra, and *Isbrandtsen Co., Inc. v. National Marine Engineers' Beneficial Ass'n.,* supra, where contrary results were reached. But, it may be noted, it is conceivable that were the courts in these cases confronted with service on an official of a Joint Board, as here, rather than, as they were, with service upon an official of a Local Union, they would arrive at the same decision we do, feeling impelled so to do under the authority of the Federal Court of Appeals' holding in *Claycraft Co. v. United Mine Workers of America,* supra.

In conclusion, after a comprehensive review of the decisions of the various State and Federal courts, especially of the appellate holdings on the subject, we are convinced that the International Ladies Garment Workers' Union had sufficient notice of this action, that it had an opportunity to be heard, and that it was performing activities within this Commonwealth sufficient to validate service upon it and to confer jurisdiction on our courts.

Order affirmed, costs to abide the event.

————

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Josephine Spica, plaintiff in this case, filed a Bill of Complaint in Equity against the International La-

dies Garment Workers' Union, (hereinafter referred to as the ILGWU) and William Ross, praying that she be reinstated to her position as business agent of Local 15, ILGWU (from which she had been dismissed), and that she be awarded damages in the sum of $50,-000. The defendants filed preliminary objections, through an appearance de bene esse, averring that the Court had no jurisdiction over the ILGWU because it was not engaged in business at the place where the service was made and that the person to whom the Complaint was handed was not an officer, employee or registered agent of ILGWU.

There are two questions before us: 1. Does service upon a local labor organization constitute service upon the international labor organization with which it is affiliated? 2. Does the ILGWU regularly conduct business within the state in such a manner as to make it amenable to personal service?

This Court has answered both these questions in the affirmative. I dissent on the following exposition of the facts and the law involved.

Rule 2157 (a) of the Rules of Civil Procedure (Pa. Stat. Ann. Tit. 12, Rule 2157) provides: "Service of process upon an officer or a registered agent of an association, or upon the manager, clerk or other person for the time being in charge of any place where such association regularly conducts any business or association activity shall be deemed service upon the association, provided that the person served is not a plaintiff in the action.

The Sheriff of Philadelphia County made service in this case on Abraham Bloomfield at 929 North Broad Street in Philadelphia. Is Mr. Bloomfield an officer or a registered agent of the ILGWU? The answer is not left to speculation or inference. Bloomfield testified at length on his status, and the plain-

tiff did not refute his assertions. Mr. Bloomfield was asked the following questions and he gave the subjoined answers: "Q. Mr. Bloomfield, do you hold any office in the International Ladies' Garment Workers' Union? A. *No.* Q. Are you or have you ever been designated as an agent or representative of the International? A. *No, sir.* . . . Q. Is there any individual in the Philadelphia Dress Joint Board at 929 North Broad Street who is in the pay of the International? A. *No, sir.* Q. Or who is an agent of the International? A. *No.* Q. Or who is authorized to represent the International in any way? A. *No.* Q. Were you ever authorized by the International to accept any papers served upon you for the International? A. *No.* . . . Q. Mr. Bloomfield, does the ILGWU have an office in Philadelphia? A. *No, sir.*"*

The Majority adds up all these "No's" and arrives at the startling total of *Yes.*

The building in which the Complaint was served carries across the facade the title: "International Ladies' Garment Workers' Union." The door of the building bears the sign: "Philadelphia Dress Joint Board." Was the plaintiff an employee of the Philadelphia Dress Joint Board or of the International Ladies Garment Workers' Union? The Philadelphia Dress Joint Board is composed of representatives of seven local unions of the ILGWU and, in many ways, enjoys autonomy. The record demonstrates that Miss Spica's difficulties were with the Philadelphia Dress Joint Board, not the ILGWU, whose offices are in New York.

In substantiation of its averment that it does not do business in Philadelphia in the sense intended by Rule 2157 of the Rules of Civil Procedure, the ILGWU

---

* Italics throughout, mine.

called as witness James Lipsig, Assistant Executive Secretary of the ILGWU. His statements were not refuted by the plaintiff. In answer to the question put to him, Mr. Lipsig replied as follows: "Q. Does it have any other offices outside of the office you just mentioned? A. *It does not.* Under the constitution of the ILGWU, and particularly under Section 9 of Article 1, the General Office of the ILGWU shall be situated in the City of New York and may not be removed from there except by a decision of a convention, regular or special, of the ILGWU. . . . Q. Does it transact any business as an International Union in Philadelphia at all? A. *It does not.* Q. Does it transact such business as a Union—as a Union, does it transact such business outside of New York City? A. *It does not.* Q. With reference to the Joint Board located at 925-27-29 North Broad Street, Philadelphia, does the International do any of its business at that location? A. *It does not.* Q. As an International, does it have any offices operating on its behalf at the Philadelphia address of the Joint Board at 925 to 29 North Broad Street. A. *It does not.* Q. Does it have any paid agents there? A. *It does not.*"

From all these positive "It does nots" the Majority comes to the interesting conclusion that the ILGWU *does.*

Mr. Bloomfield was also questioned on this same subject and he answered as follows: "Q. Did the International have anything to do with the payment of the cost of the erection of that building [the building in Philadelphia]? A. *None whatsoever.* Q. Does the International in any way perform any of its duties as an International in Philadelphia? A. *None whatsoever.* Q. Does it have any office in Philadelphia? A. *No, sir.* . . . Q. And does the International function in any of those capacities in Philadelphia? A. *No, sir.* Q. Does the In-

ternational function as an International or do any of its business as an International in Philadelphia? A. *No, sir."*

And from all these uncontradicted "None whatsoevers" and "No, sirs", the Majority concludes that the ILGWU *does* do business in Philadelphia.

Instead of being guided by the testimony, the Majority, in reaching its conclusions, has followed a plausible theory which, despite its surface persuasiveness, is still only a theory. The Majority urges that the International directs the policies of its branches, which, to a certain extent is true. It points out also that the ILGWU is armed with wide-sweeping authority, which is also true. But we are confronted in this case with a condition, not a theory. If the ILGWU does not do business at 929 North Broad Street, Philadelphia, and Mr. Bloomfield is not an officer or registered agent of the ILGWU, how can service on him at the place indicated be legal service against ILGWU? The brain controls the entire body, but if a person suffers a broken ankle, the splint or cast is placed on the lower leg, not around the person's head.

Stupendous and far-reaching as is the tent of the power of the ILGWU over the entire organization, the tent is not without vent-holes of local autonomy. Section 3(a) of Article 6 of the Constitution and By-Laws of the ILGWU reads: *"Joint Boards shall have the right*: To pass upon the qualifications of their own members and *to discipline their members* for misconduct upon conviction thereof by fine, suspension or expulsion from the body, and to declare such members disqualified to hold office or membership in the Joint Board, or any other elective or appointive position in any L.U. for a specified period of time."

Section 14 of Article 5 of the Constitution reads: "No L.U. or other subordinate body shall be author-

ized to make contracts or to incur liabilities for the I.L.G.W.U., and the I.L.G.W.U. shall not be responsible upon any such contracts or liabilities unless authorized in writing by the G.E.B."

That officers of the I.L.G.W.U. and officers of the Joint Board do not pool or intermingle their respective duties is evidenced by the fact that they take separate oaths: Section 11, Article 2, provides: "Upon installation, each officer of the I.L.G.W.U. and each officer of a J.B., a D.C. or a L.U., and each Executive Board member and each business agent of a J.B., D.C. or L.U. shall take an oath to perform the duties of his office or position . . ."

The plaintiff in this case held office in the Philadelphia Dress Joint Board, not in the international office. Paragraph 8 of her complaint shows that her quarrel is with the Joint Board, not the ILGWU.

I believe that the Majority glosses over the most important feature in this case, namely, Is the Philadelphia Dress Joint Board directly responsible to Miss Spica for whatever wrong it may have accomplished against her, and is it financially able to meet any claim she may prove against it? Both these questions must be answered in the affirmative and, with that affirmation, the litigation should end. No one questions that the Joint Board has the power and resources to meet Miss Spica's demands if they are supported with legal proof. Why, then, the recourse to the ILGWU? It would almost seem that the purpose of the lawsuit is to establish some doctrine which has nothing to do with resolving the claim outlined in the complaint.

This is not the case where, unless a superior governing body, is made a party litigant, the complainant can have no substantial redress. This is not a case where, if the plaintiff is compelled to proceed against the Joint Board and she wins, she will obtain

an order on empty coffers or on officials holding no badge of authority. At the time of the argument before us on this appeal, counsel for the ILGWU announced in open court that the Philadelphia Dress Joint Board stands ready and is financially able to discharge any obligation imposed upon it by the Court after a hearing of Miss Spica's case. Why, then, this necessity for a decision on the inner workings of the ILGWU?

The Court below, which held that the service was valid, saw in the ILGWU's name spelled out in large silver letters on the building in Philadelphia, a confirmation of its decision in the case. The Majority of this Court apparently has also been impressed by the luster of those silver symbols, and it goes on to add that the stationery of the Joint Board, which "bears the official seal of the International is headed 'Philadelphia Dress Joint Board, International Ladies Garment Workers' Union, American Federation of Labor.' " But if this legend on the letterhead is proof that the ILGWU is in business at 929 North Broad Street, Philadelphia, then, by the same token, the American Federation of Labor, is in business at the same place. However, it would be absurd to assume that the American Federation of Labor could be made party to a lawsuit by service on any official at the building with the silver letters.

While the outer dress of a building can, in the absence of more substantial inner garments and identifying features, offer a clue as to the name of the occupant, it is by no means conclusive proof of ownership. Here again the Majority followed a theory, instead of the testimony in the case. It was testified, and not denied, that the building at 929 North Broad Street, Philadelphia, is owned by the Philadelphia Dress Joint Board and that the ILGWU contributed

in no way to its purchase or erection. Mr. Bloomfield, as already indicated, testified at length in this connection.

But the Majority ignores the highway paved with substantial evidence and takes up the side road of theory which leads to a destination far removed from a logical solution of the case. Still on this subsidiary road of theory, the Majority argues: "Nor can there be any question as to the opportunity of the defendant International to be heard in our courts. We are aware of no bar to its appearance before a court in this State. The distances involved are not great. And its appearance de bene esse, and at the depositions and hearings in the court below, convince us that it has sufficient opportunity to be heard."

But with this kind of argument, the Majority descends with a resounding hammer on the anvil of irrelevancy. Who questions that the International may be heard in our Courts? Who suggests that there could be a bar to its appearance before a Court in this State? That is not the issue. The issue is whether the ILGWU should be *compelled* to appear when it is not a defendant, and when it is already clear that the plaintiff has an adequate remedy against those immediate responsible.

The Majority says that "the distances involved are not great." This is not only an irrelevancy but a patronizing irrelevancy. Is a defendant obliged to answer merely because of proximity, regardless of legal answerability? If propinquity is the test of responsibility, then one could always sue the Pennsylvania Railroad, regardless of agency, tort, or jurisdiction.

Even so, distances are not always so inconsequential as the Majority assumes them to be in this case. The ILGWU is an international organization. Would the New York office be required to answer lawsuits in

Labrador and travel to that Arctic region on the supposition that the distances are not great? Would it be compelled to travel to California, because it would be assumed that the distances are not great?

Nor is it proper and just for the Majority to say that because the ILGWU has appeared de bene esse, it should be compelled to answer to the merits. Appearance de bene esse is the specific method open to a defendant to object to an ostensible Court jurisdiction, without admitting it. If the ILGWU had not replied at all, its silence could be interpreted as an admission of jurisdiction. In the case of *Pellegrini v. Roux Distributing Co., Inc.,* 170 Pa. Superior Ct. 68, where the defendant had objected to the jurisdiction of the Court but the lower Court held that since the defendant's insurance company had requested an examination of the plaintiff (in a personal injuries action) prior to the entry of suit, it had thus admitted the Court's jurisdiction, the Superior Court reversed the order and said: "The conduct of its insurance company did not amount to a general appearance of Roux Co. . . ."

By appearing de bene esse a defendant is not in Court at all. In the case of *Everett v. Niagara Ins. Co.,* 142 Pa. 322, 330, the defendant made a special appearance and then moved for judgment of nonsuit against the plaintiff, which motion was granted. Later the lower Court struck off the nonsuit, and this Court affirmed the action, saying: "The special ground assigned in the opinion of the learned judge below is that, the service having been set aside, and the defendant having appeared de bene esse only, he was not in court, and had no standing to take any such step in the cause. The entry of the nonsuit was therefore *no more than any unauthorized entry on the record by a stranger.* This view of the extent of an appearance de bene esse is sustained by the general understanding

and practice of the profession, and by the authorities as far as they appear to have passed upon the subject."

In *Farmers Trust Co. v. Alexander*, 334 Pa. 434, we held that the function of an appearance de bene esse is to show that the person so appearing refuses to submit to the jurisdiction of the court unless it is finally determined by the court that he has forever waived his right to question the court's jurisdiction over his person. Of course, the ILGWU here not only did not waive its right to question the Court's jurisdiction, but contested it from the beginning and still contests it.

The Majority Opinion points to the case of *Grand Lodge of the Brotherhood of Railway and Steamship Clerks v. Girard Lodge*, 384 Pa. 248, in assumed support of its position. A reading of the very excerpt quoted by the Majority will show that the *ratio decidendi* in the *Grand Lodge* case is entirely different from the one in the case at bar. There, as the Majority has quoted, we said: "A union local has no more power than that assigned to it by the parent body of which it is a part . . . In a labor union the central body is the custodian of the reservoir of power which it channels into the locals in such manner and according to such methods as will best serve the entire organization. That power may be shut off when *it is abused by a local* (under the constitution and laws which it has agreed to obey) and especially when that abuse may jeopardize the standing, prestige and efficacy of the central body."

There is no assertion that in the case at bar any local has abused its power. It is not averred that a local union is seeking to exercise more power than that assigned to it. The issue here is whether a parent organization is responsible for the acts of a Board (made up of several locals) acting independently of the International.

If the theory of the Majority be carried to its logical conclusion it would mean that the American Legion headquarters in Indianapolis, Indiana, would be responsible for the dismissal of a typist (whom it did not know and with whom it had had no contact) at one of its posts in distant Albuquerque, New Mexico. It would mean that all large fraternal organizations, such as the Moose and Elks, would be responsible for every localized contact entered into by distant individual lodges.

I believe that the decision in this case goes far beyond what is required under the pleadings and the evidence, I am satisfied that the Majority's Opinion says much that is right but in a wrong connection, I fear that the Court here is laying down a precedent which may complicate and retard the adjudication of just complaints of employees and contractees within localized territories, and it is clear to me that this decision sets up a novel and intricate procedure for the disposition of the plaintiff's claim when an adequate and appropriate one already exists.

For all of these reasons I dissent.

Mr. Justice COHEN dissents.