Charles **DEBOLES**
and
Virgil O. **Griffis**
v.
**TRANS WORLD AIRLINES, INC.,** et al.
**Civ. A. No. 71–2945.**

United States District Court,
E. D. Pennsylvania.

Oct. 31, 1972.

Francis L. White, Jr., Duane, Morris & Heckscher, Philadelphia, Pa., for plaintiffs.

Robert M. Landis, Dechert, Price & Rhoads, Richard Kirschner, Wilderman, Markowitz & Kirschner, Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION AND ORDER

VanARTSDALEN, District Judge.

Plaintiffs have filed a class action on behalf of themselves and all Union mem-

**1278**

ber employees of Trans World Airlines, Inc. (TWA) who were employed at TWA's plant at the Kennedy Space Center (KSC) prior to January 28, 1970. Plaintiffs assert that as a class they were unlawfully and hostilely discriminated against in the establishment of their seniority rights at TWA plants other than KSC by their labor Union representatives with the participation of TWA.

Prior to January 28, 1970, KSC employees acquired seniority only at the KSC plant. Other TWA employees acquired seniority at all TWA plants except KSC. So far as seniority rights were concerned, it was the same as if KSC was an entirely separate corporate employer from TWA. On January 28, 1970, by reason of a collective bargaining agreement between TWA and the International Association of Machinists and Aerospace Workers, AFL–CIO (International), system-wide seniority went into effect, whereby KSC employees started to acquire system-wide seniority effective as of January 28, 1970. TWA employees, other than KSC employees, retained their system-wide seniority theretofore acquired effective as of the date of their original employment by TWA. Thereafter, KSC employees who were forced to accept work at other TWA plants by reason of a reduction of the labor force at KSC obtained seniority at the relocated plant only as of January 28, 1970, irrespective of the date of their original employment by TWA, whereas all other TWA employees held seniority effective from date of employment. As a result, all plaintiffs have potentially less system-wide seniority than persons hired subsequent to them and prior to January 28, 1970, and the individual plaintiffs assert they have been prematurely furloughed because of the unfair seniority classification.

Plaintiffs assert that the defendants have violated the Railway Labor Act, 45 U.S.C. § 151 et seq., and challenge the validity of the collective bargaining agreement itself. They seek retroactive system-wide seniority effective as of the date of their original employment, reinstatement of those furloughed who would not have been furloughed had their seniority been established as of the date of their original employment, and damages for those who were thus prematurely furloughed. Plaintiffs contend that Section 2 (Fourth) and (Eleventh) of the Railway Labor Act, 45 U.S.C. § 152 (Fourth) and (Eleventh),[1] was vio-

1. Fourth. Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization, or to deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments, or other contributions: *Provided*, That nothing in this chapter shall be construed to prohibit a carrier from permitting an employee, individually, or local representatives of employees from conferring with management during working hours without loss of time, or to prohibit a carrier from furnishing free transportation to its employees while engaged in the business of a labor organization.

Eleventh. Notwithstanding any other provisions of this chapter, . . . any carrier or carriers . . . and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted—
(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effec-

lated because plaintiffs were required, as a condition of employment, to join a labor Union where membership was not available to all members on the same terms and conditions.

The Union is additionally accused of breaching its duty of fair representation. Plaintiffs claim that the Union deliberately misrepresented the nature of its collective bargaining efforts for a period of time extending over four years prior to 1970. The Union is alleged to have told the KSC employees that it was actively pursuing retroactive seniority for them and that this benefit could be obtained but for TWA's refusal to alter its seniority system. The plaintiffs allege that in actuality TWA was not only amenable to retroactive system seniority, but both TWA and the Union, as evidenced by a written "sign-off agreement," agreed to extend retroactive seniority to the KSC employees, but this was deleted from the final contract not on the urging of TWA, but rather on the initiative of representatives of the Union. Becase of these deliberate misrepresentations, plaintiffs assert that the Union has breached its duty of fair representation, that TWA was a party to the violation, and both are guilty of illegally and hostilely discriminating against the employees at KSC.

The International and District Lodge 142, IAMAW, AFL–CIO (District Lodge), preliminarily filed a motion to quash service. All parties have filed motions for summary judgment.

I

The International and District Lodge maintain that service of process as to them is ineffective and must be quashed. Service was made upon S. R. Canale, President of the Local Lodge at its of-

fices in Barby, Pennsylvania. The International and District Lodge argue that service was not made upon ". . . an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process. . . ." Fed.R.Civ.P. 4(d)(2). Furthermore, defendants contend that the International and District Lodge have no place of business or residence in Pennsylvania and engage in no business in the Commonwealth.

The Federal Rules of Civil Procedure provide two methods of service upon unincorporated associations. In addition to Fed.R.Civ.P. 4(d)(3) which specifically provides for service on a proper agent of the unincorporated association, Fed.R.Civ.P. 4(d)(7) generally provides for service in any manner designated by the state law in which the district court is located. Under both rules, effective service of process upon an out of state "parent" labor union through service upon the local union is determined by the degree of independence of the local union. If the local union exercises sufficient control over its own daily activities and is vested with authority over matters central to its functioning, thereby rendering it a separate and distinct entity from the international and district organizations, the local will be declared autonomous and service upon the local will not be effective service upon the international or district. Krulikowsky v. Metropolitan Dist. Council of Philadelphia, 270 F. Supp. 122 (E.D.Pa.1967); see also Morgan Drive Away, Inc. v. International Bhd. of Teamsters, 268 F.2d 871 (7th Cir.), cert. denied, 361 U.S. 896, 80 S.Ct. 199, 4 L.Ed.2d 152 (1959), construing § 301(d) Labor-Management Relations

tive date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: *Provided,* That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any

other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure to the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership.

Act, 29 U.S.C. § 185(d); Keenan v. Metropolitan Dist. Council of Philadelphia, 266 F.Supp. 497 (E.D.Pa.1966). On the other hand, if the local's power is usurped by the international or district so that the local does not have control over its own affairs and finances, service upon the local will be deemed effective service upon the international or district. See International Bhd. of Teamsters v. United States, 275 F.2d 610 (4th Cir.), cert. denied, 362 U.S. 975, 80 S.Ct. 1060, 4 L.Ed.2d 1011 (1960); Claycraft Co. v. United Mine Workers of America, 204 F.2d 600 (6th Cir. 1953); Kreshtool v. International Longshoremen's Ass'n, 242 F.Supp. 551 (D.Del.1965).

The Pennsylvania law has developed along similar lines. The Pennsylvania Supreme Court, in Spica v. International Ladies Garment Workers' Union, 388 Pa. 382, 130 A.2d 468 (1957), construed Pa.R.Civ.P. 2157(a), 12 P.S. Appendix, and held that service upon the Joint Board, an aggregation of local unions, was valid service upon the International and stated:

> Looking at the organization as a whole, as the picture emerges from its constitution, we find an association wherein the ultimate power in terms of membership, officers, grievances, disputes and contracts with employers, and finances lies with the General Executive Board, the governing organ of the International, and where a direct supervision is exercised by the General Executive Board over vital contemporary labor functions such as monetary benefits and general strikes. All monies and property ultimately belong to the International.

Id. at 391, 130 A.2d at 472.

■■ Like the state court examination in Spica, federal courts also scrutinize the international constitution as a test to determine the extent of the independence of the local union. See International Bhd. of Teamsters v. United States, supra; Claycraft Co., supra; Krulikowsky, supra. A reading of the international constitution (constitution) in this case reveals that Local Lodge 1776, IAMAW (Local Lodge) is not independent of the control of the International or District Lodge. Service of process therefore is effective as to all Union defendants.

*Internal Structure.* The constitution specifies the internal structure and organization of the Local Lodge. Before a Local Lodge can be chartered by the International President (President), the District Lodge must first be consulted and its sanction obtained (Art. A, Sec. 3). While the foregoing certainly is not a pervasive intrusion into the organization of the Local, the constitution also delineates the minimum membership requirements of the Local (Art. A, Sec. 1), its membership eligibility (Art. I, Sec. 1), the procedure for applying for membership (Art. I, Sec. 2), the monthly dues of a member (Art. I, Sec. 9), and the duties of a member (Art. K).

The constitution does not overlook the officers of the Local. It specifically designates what officers a Local will have (Art. B, Sec. 1), the qualifications for office (Art. B, Sec. 3), the nominating and election procedures (Art. B, Sec. 4), the date that these officers are installed (Art. B, Sec. 5), and finally a detailed enumeration of the duties of each of the local officers (Art. C).

*Internal Affairs.* The Executive Council of the International (Council) consisting of the President, the General Secretary-Treasurer and the nine General Vice-Presidents, has the power to require reports from the Local or District Lodge officers and also to suspend or remove these officers for justifiable cause (Art. V, Sec. 2).

The President is vested with supervisory power over all Local and District Lodges. He can suspend any Local or District Lodge or any of their officers charged with incompetency, negligence, insubordination, failure of duty, or any violation of the constitution while such charges are pending final disposition. With the approval of the Council, and

pending the filing of charges and their disposition, he can assume direct control over the Local or District Lodge whenever he believes the Local or District Lodge is violating the constitution or jeopardizing the welfare of the membership. Also, with the approval of the Council, the President may revoke the charter of the Local or District Lodge if either of these organizations is found guilty of a constitutional violation (Art. VI, Sec. 5).

While the trustees of the Local do have charge of its property, the trustees are nonetheless still liable to the Grand Lodge, consisting of the Council and representation of Local Lodges, for all funds and other property under the trustees' control (Art. C, Sec. 13).

The constitution also provides for control of funds and property by the International in case of a revocation of the Local's charter. If the Local is not reopened within six months from the date of the initial revocation, the Local's property becomes the property of the International (Art. D, Sec. 12).

To properly serve its members, the Local or District Lodges establish business representatives who are controlled and supervised by the President (Art. XI, Sec. 2). The constitution further requires that these business representatives file financial and activity reports with the President (Art. XI, Sec. 5).

The constitution also requires the Financial Secretary of the Local to submit a monthly report to the International detailing the number of members of the Local, any additions or subtractions to this membership, a list of individuals expelled and applications rejected, and the reasons therefor. The Financial Secretary must also remit monthly per capita taxes called for in the monthly report (Art. C, Sec. 4).

*Finances.* The General Secretary-Treasurer of the Council has the authority to audit the books of any Local or District Lodge whenever he believes an audit is advisable; the refusal to comply with such an audit is punishable by sus-

pension or expulsion. (Art. VII, Sec. 5). The International is additionally involved in the finances of the Local and District Lodge by assuming the cost of the bonding of any officer in these subordinate organizations. (Art. VII, Sec. 6).

With respect to the management, investment, and disbursement of the Local's funds and property, the constitution dictates to the Local specifically how these functions must be executed. (Art. D, Sec. 9). This section also authorizes the International to undertake protective action in the presence of "expenditures or contemplated expenditures in violation of this Section."

*External Affairs.* The most prized collective bargaining cudgel, the strike, is held solely in the hands of the International. Only the President, in certain emergency situations, and the Council at all other times may authorize a strike action. Any violations of this provision will result in the violators being deprived of strike benefits and financial aid during the controversy (Art. XVIII, Sec. 1). Once an authorized strike has begun, it is again only the International, in the form of the Council, that can terminate a strike. (Art. XVIII, Sec. 4).

*Pension Plans.* Grand Lodge officers receive a pension that is administered by the President, General Secretary-Treasurer and a General Vice-President (Art. XIV, Sec. 2) and is funded by periodic contributions as the "[Council] deems appropriate." (Art. XIV, Sec. 9).

The pension plan for the business representatives is also administered by the above officers (Art. XV, Sec. 2), but is funded not only by the Grand Lodge but also by the Local and District Lodges (Art. XV, Sec. 9).

Officers of the Local and District Lodges are also covered by a pension plan, again funded by the Local and District Lodges irrespective of whether its officers are eligible for a pension (Art. XVI, Sec. 9), and administered not by Local officials but by the International in the form of the President, General

Secretary Treasurer and General Vice-President. (Art. XVI, Sec. 2).

*Disciplinary Action.* The constitution not only fully defines what constitutes improper conduct on the part of the Local and District Lodge (Art. L, Sec. 1), the officers and representatives (Art. L, Sec. 2), and the individual members (Art. L, Sec. 3), but also the procedures to be followed in processing these violations (Art. L, Secs. 5, 6, 7).

*Relationship of District Lodge and Local.* Finally, the constitution also subjects the Local to the general control and authority of the District Lodge. (Art. XXIV, Sec. 4). The District Lodge has specific authority to ". . . determine the proportion and method of representation therein of L.Ls. [Local Lodges] within its jurisdiction . . .." Art. XXIV, Sec. 8). Section 8 also authorizes the District Lodge to finance its work by collecting revenues from the Local. But it is the International that ultimately controls the purse strings in that the District Lodge, like the Local, can only loan, appropriate, and invest its funds as directed by the constitution of the International (Art. XXIV, Sec. 11).

It is clear from the foregoing that the Local and District Lodges are not independent autonomous entities, but are actually firm components of the International. The defendant contends that Art. XXIV, Sec. 1 through 4 and Art. D, Sec. 1, establish the autonomy of the District and Local Lodges respectively. This contention cannot be sustained by a reading of these sections. If anything, these sections denote even more clearly the dependence, rather than the independence, of these two subordinate units. Section 3 of Art. XXIV establishes the jurisdiction of the District Lodge but it is the Council that determines and defines this jurisdiction. Section 4, while allowing the District Lodge to propose bylaws and amendments also states that these bylaws and amendments cannot be contrary to the provisions of the International constitution and must be submitted to the Presi-

dent who has the power to examine, correct, and approve before any final adoption.

Similarly, Article D, Section 1, allows the Local to adopt its own bylaws, again subject to both the provisions of the constitution and the examination, correction, and approval of the President. In addition, this section allows the President to determine the effective date of any bylaws or amendments that he does approve. Under these conditions, any autonomy vested in the District Lodge and Local pursuant to the sections of the constitution cited by the defendant, considering the all encompassing provisions of the constitution and the ultimate review powers of the President, are, in fact, illusory. The constitution in reality displays

> such extensive control and direction of the local as to warrant the conclusion that the local is a component of the International. The local is the internal organizational means which the International employs to keep its accounts of its membership, to collect its revenues, and to execute and enforce its policies.

International Bhd. of Teamsters v. United States, *supra*, 275 F.2d at 614. For these reasons, the motions to quash service by the defendants, International and District Lodge, will be denied.

## II

The defendants next assert that Section 204 of the Railway Labor Act, 45 U.S.C. § 184, has pre-empted jurisdiction from the state and federal courts by vesting the System Board of Adjustment with exclusive jurisdiction over these disputes. The collective bargaining agreement and the purported "sign-off" agreement constitute, according to the defendants, the basis of plaintiff's complaint. Since an interpretation of these agreements is required to resolve the dispute, plaintiffs contend that the System Board of Adjustment possesses exclusive jurisdiction over the matter. Gunther v. San Diego & A. E. Ry. Co., 382 U.S. 257, 86 S.Ct. 368, 15 L.Ed.2d

308 (1965); Keay v. Eastern Air Lines, Inc., 440 F.2d 667 (1st Cir. 1971).

■■ While the defendants certainly are correct in their statement of the law, they err in characterizing this dispute as one directly involving the meaning or application of a collective bargaining contract or agreement. Rather than an interpretation of a contract, the focus of the complaint is upon the hostile discrimination and unfair treatment dealt the plaintiffs by their Union representatives. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), is an analogous case where suit was brought by members of a labor organization against their union alleging unfair representation. The Supreme Court, at 44, 78 S.Ct. at 101, in ruling that exclusive jurisdiction did not lie with the National Railroad Adjustment Board, stated:

> But § 3 First (i) by its own terms applies only to "disputes between an employee or group of employees and a carrier or carriers." This case involves no dispute between employee and employer but to the contrary is a suit by employees against the bargaining agent to enforce their statutory right not to be unfairly discriminated against by it in bargaining. The Adjustment Board has no power under § 3 First (i) or any other provision of the Act to protect them from such discrimination. Furthermore, the contract between the Brotherhood and the Railroad will be, at most, only incidentally involved in resolving this controversy between petitioners and their bargaining agent. (footnotes omitted.[3]

Defendants respond by citing Gainey v. Brotherhood of Railway & Steamship Clerks, 275 F.2d 342 (3rd Cir. 1960), aff'g 177 F.Supp. 421 (E.D.Pa.1959), cert. denied, 363 U.S. 811, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960). This case involved an action by union members against their union representatives and the railroad emanating from an "agreement" equalizing wages for certain workers in different working regions and evidenced by a letter from a union official to an official of the railroad. The basis of plaintiff's complaint was that the alleged agreement had never been implemented. The district court dismissed the action, Gainey v. Brotherhood of Railway & Steamship Clerks, 177 F.Supp. 421 (E.D.Pa.1959); the circuit court upheld the decision stating that such a case was within the jurisdiction of the National Railroad Adjustment Board. Gainey v. Brotherhood of Railway & Steamship Clerks, 275 F.2d 342 (3rd Cir. 1960).

*Gainey* is distinguishable from the present case on several grounds. In *Gainey,* the cause of action was based solely upon the interpretation of the terms of an agreement. *Id.* at 344. But in the instant case, the complaint alleges a series of events and facts, only one of which is the existence of the "sign-off" agreement. Unlike *Gainey* where the agreement constituted the sole basis of the complaint, the plaintiffs here allege a continuum of misrepresentations by Union officials, one of which is evidenced by the "sign-off" agreement, but all of which constitute hostile discrimination by the Union. The agreement is presented to the court not to be interpreted and enforced, but to be considered as proof of defendants' hostile discrimination. Plaintiffs do not and cannot in this action contend that the "sign-off" agreement is a legally binding contract.

In addition, the court in *Gainey,* by focusing upon the interpretation of the alleged agreement, viewed the dispute as one between an employee or groups of employees and the *carrier,* thereby subjecting the case to the jurisdiction of

---

3. § 3 First (i), 45 U.S.C. § 153, refers to the jurisdiction of the *railway* carrier adjustment boards while § 204 of the Act, 45 U.S.C. § 184, delineates the jurisdiction of *air* carrier adjustment boards. The language cited by the Supreme Court from § 3 First (i) is identical to that of § 204.

the National Railroad Adjustment Board. The court did not recognize the dispute as one based on a charge of hostile discrimination and primarily involving an employee or groups of employees and *their bargaining representatives*. Finally, the defendants in the instant case, in citing *Gainey*, have failed to point out that the district court did consider the issue of hostile discrimination as a *possible* basis of federal jurisdiction, but decided that such jurisdiction was lacking in that the complaint did not allege facts sufficient to establish hostile discrimination. Gainey v. Brotherhood of Railway & Steamship Clerks, 177 F.Supp. 421, 430–431 (E.D.Pa.1959). The circuit court declared that the issue did not have to be decided since the plaintiffs had failed to allege exhaustion of their internal remedies or adequate reasons for failure to do so. Gainey v. Brotherhood of Railway & Steamship Clerks, 275 F.2d 342, 345 (3rd Cir. 1960).

■ The complaint in this case sufficiently alleges hostile discrimination and sets forth a dispute primarily involving TWA employees and their Union representatives. As such, the case is subject to federal court jurisdiction. Glover v. St. Louis, San Francisco Ry., 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969) ; Brady v. Trans World Airlines, Inc., 401 F.2d 87 (3rd Cir. 1968), cert. denied, Int. Ass'n of Machinists v. Brady, 393 U.S. 1048, 89 S.Ct. 680, 21 L. Ed.2d 691 (1969) ; Thompson v. Brotherhood of Sleeping Car Porters, 316 F. 2d 191 (4th Cir. 1963). As here, *Brady* involved a charge of hostile discrimination by TWA and the International. In asserting federal jurisdiction, the court stated:

There is good reason for denying the jurisdictional authority of adjustment boards in so far as controversies between employees and their bargaining representatives are concerned. The membership of such boards is designed to give representation to management and to the union. Normally the board's composition would present no problem since its express statutory authority is to hear grievances between employees and their employers arising out of the collective bargaining agreement. In such a dispute the employee would expect his union, acting under its duty to prosecute fairly the grievances of its members, to represent him before the board. This scheme, however, overlooks the possibility that the union's interest might conflict with the employee's and this is especially so in cases where the employee is charging the union with hostile discrimination. In such circumstances, the union can hardly be expected to press the employee's claim vigorously and forthrightly. (footnote omitted).

Brady v. Trans World Airline, *supra*, 401 F.2d at 93.

The court then continued and quoted a passage from the decision of the district court:

It is simply repugnant to our standards of fundamental fairness and totally unrealistic to require an employee to submit a dispute he has with his bargaining agent for final determination to persons selected by and representing the bargaining agent. (footnote omitted).

*Id*. Considering that the plaintiffs allege hostile discrimination against all three levels of the Union, it would be unrealistic and probably an invalid conflict of interest to have the System Board of Adjustment decide this dispute.

■ The joining of the employer, TWA does not alter the original character of the controversy. It is still a dispute primarily between employees and their Union and the fact

[t]hat the employer was joined to afford complete relief and that the dispute may incidentally involve construction or interpretation of the collective bargaining agreement does not change the basic fact that the Railway Labor Act does not authorize

adjustment boards to hear an employee's dispute against his union. *Id.*

For the foregoing reasons, Section 204 of The Railway Labor Act, 45 U.S.C. § 184, does not preempt federal jurisdiction on the theory of plaintiffs' complaint.

### III

■ The defendants also move for summary judgments asserting that plaintiffs' allegations constitute merely unfavorable, and not discriminatory action by TWA and the Union. The defendants cite a legion of cases holding that a mere agreement benefiting the majority of union members to the detriment of a small minority does not necessarily establish hostile discrimination. Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); Simberlund v. Long Island R. R. Co., 421 F.2d 1219 (2nd Cir. 1970); Cunningham v. Erie R. R. Co., 266 F.2d 411 (2nd Cir. 1959); See also Balowski v. International Union, 372 F.2d 829 (6th Cir. 1967); Thompson v. Brotherhood of Sleeping Car Porters, *supra*. But the contentions of the plaintiffs transcend the ambit of unfavorable treatment and do, indeed, allege deceitful and hostile discrimination. These allegations, when viewed in the perspective of a motion for summary judgment, are sufficiently supported by the record to deny defendants' motions for summary judgment.

■ While the defendants correctly demonstrate that a collective bargaining agreement favoring a majority of union members and disfavoring a minority is a frequent occurrence, such an occurrence does not justify the bargaining agent to abrogate its duty of fair minority representation. The bargaining agent has the responsibility to fairly and honestly represent all of its constituents and not merely those numbering a majority. As stated by the Supreme Court in Steele v. Louisville & Nashville R. R. Co., 323 U.S. 192, 202, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944):

The fair interpretation of the statutory language is that the organization chosen to represent a craft is to represent all its members, the majority as well as the minority, and it is to act for and not against those whom it represents. It is a principle of general application that the exercise of a granted power to act in behalf of others involves the assumption toward them of a duty to exercise the power in their interest and behalf, and that such a grant of power will not be deemed to dispense with all duty toward those for whom it is exercised unless so expressed. (footnote omitted).

Although the bargaining agent is granted a wide range of reasonableness in the exercise of its statutory duty, its representation is "subject always to complete good faith and honesty of purpose . . . ." Ford Motor Co. v. Huffman, *supra*, 345 U.S. at 338, 73 S.Ct. at 686.

The Supreme Court in *Steele* developed the duty of fair representation in the context of racial discrimination. Since then, the doctrine has been expanded to include not only bad faith in the processing of individual grievances, Conley v. Gibson, *supra*, but also many forms of arbitrary treatment by the union. Thompson v. Brotherhood of Sleeping Car Porter, *supra*; Cunningham v. Erie R. R., *supra*.

The test to determine the presence of union bad faith and invidious discrimination has been set forth in *Thompson*, *supra*, 316 F.2d at 200:

[I]t appears necessary to pursue only one line of inquiry to resolve the questions of "invidious discrimination," "reasonableness," "good faith and honesty": Did the plaintiff show that he received different or substantially sub-standard representation at the hands of the Brotherhood? If so, was it because of some improper reason, such as his unsatisfactory union status? Did this treatment cause him injury? If the answers of the trier of fact to the three questions are

in the affirmative, the plaintiff is entitled to relief.

In applying the foregoing test, it is important to note that the plaintiffs' complaint and accompanying record need only establish those facts required to withstand a motion for summary judgment. In examining the record,

> the court must take that view of the evidence most favorable to the party against whom the motion is directed, giving to that party the benefit of all favorable inferences that might reasonably be drawn from the evidence, thereby placing the burden of proving the absence of any factual issue on the movant.

Janek v. Celebrezze, 336 F.2d 828, 834 (3rd Cir. 1964).

The plaintiffs allege that they received substantially substandard representation during the 1970 contract negotiations and that the Union, since 1965, deliberately misled the plaintiffs concerning the nature of the Union's collective bargaining efforts and the reasons for not securing system-wide seniority. Plaintiffs maintain that prior to the labor agreement granting KSC employees only prospective system seniority, TWA and the Union had actually agreed to give KSC workers system seniority retroactive to their original date of hire. The agreement, referred to as a "sign-off" agreement, is purportedly evidenced by plaintiffs' Exhibit A, attached to the complaint. This exhibit is a letter allegedly written but unsigned by William E. Malarkey, staff vice-president of labor relations for TWA, offering retroactive system seniority to KSC workers which supposedly was "signed-off" or agreed to by John Schwind, president-general chairman of the District Lodge.

Plaintiffs additionally contend, and the record indicates, that KSC employees ratified the collective bargaining agreement after affirmations by James Fowler, general chairman of the District Lodge, that retroactive system seniority was not included in the contract because TWA had refused to agree to it.

Defendants' affidavits state that Malarkey never signed the letter offering retroactive system seniority, that there never was any such agreement between TWA and the Union, and that Schwind never saw the letter prior to his reading the plaintiffs' complaint on May 3, 1972.

Plaintiffs, on the other hand, have submitted affidavits and a portion of the minutes of the 1970 District Lodge convention indicating that TWA had offered retroactive system seniority and Schwind had agreed on behalf of the Union. Plaintiffs' affidavits also assert that Fowler represented to the KSC Union officials that their bargaining representatives were "fighting for retroactive seniority" (Affidavit of Clarence G. Potts), but it was unobtainable because TWA refused to grant such a provision. Defendants contend that their representations amounted to mere promises or at the worst, puffing. But a great distinction exists between puffing and the present allegations of deliberate misrepresentations of existing facts. Under these circumstances, there appear to be disputed facts concerning defendants' good faith and substandard representation that can only be resolved after a full hearing on the merits.

Plaintiffs must also demonstrate that the discriminatory treatment is due to an improper reason. *Thompson, supra.* Plaintiffs contend that an improper reason is present and can be inferred from the totality of events prior to and surrounding the collective bargaining negotiations. The "sign-off" agreement, the misrepresentations, and the seniority terms of the final contract are claimed to demonstrate that political pressure improperly motivated the Union representatives.

A plaintiff, in alleging unfair representation, ordinarily must isolate characteristics unique to him as opposed to his union brothers, and then establish that such characteristics do not consti-

tute a valid reason for discriminatory treatment. Lacking unique characteristics, a plaintiff may also establish that he was discriminated against because of political pressure, animosity, or "sheer favoritism." *Simberlund, supra.* These issues, which are clearly in dispute, can only be developed properly by a full hearing on the merits. The plaintiffs should be afforded the opportunity to present evidence to substantiate their position. If plaintiffs can prove the allegations of the complaint, the requisite elements of *Thompson* will be fulfilled.

■■■ Although the Union must represent factions with diverse and sometimes contradictory demands, it nonetheless owes all of its members a duty of fair representation. This duty is a fiduciary one and the Union's conduct must conform to the high standard demanded of any fiduciary relationship. Bazarte v. United Transportation Union, 429 F.2d 868 (3rd Cir. 1970). As collective bargaining agent, it must execute its responsibilities with utmost fairness and good faith, notwithstanding the countervailing demands of its constituents. If the Union is guilty of bad faith and unfair representation, it will have failed to fulfill its responsibilities and will have breached its fiduciary duty. The record in this case contains controversial factual issues satisfying the minimum elements requisite under *Thompson* to establish unfair representation. As such, the motions of the International and District Lodge for summary judgment will be denied.

■■■ The Local Lodge also moves for summary judgment claiming that it has not committed any unlawful action. But it was through the Local Lodge that the individual plaintiffs were furloughed pursuant to the seniority provisions of the collective bargaining contract. It was in Philadelphia that the plaintiffs actually experienced the results of the alleged unfair representation by Union officials. Concededly, the Local Lodge did not participate in the original dis-criminatory action but it nonetheless was partly responsible for the enforcement of the seniority provisions of the contract and the eventual furlough of the plaintiffs. It was through the instrumentality of the Local Lodge that the alleged discriminatory action of the International and District Lodge was fully effectuated. The Local Lodge, being a conduit for the International and District Lodge and being partly responsible for the furlough of plaintiffs, cannot be granted summary relief.

■■■ It is clear, however, that the defendant labor Unions are correct in stating that the mere existence of TWA's split-seniority system does not violate Section 2 (Fourth) and (Eleventh) of the Railway Labor Act, 45 U. S.C. § 152 (Fourth) and (Eleventh). Section 2 (Fourth) states that is is unlawful for a carrier to interfere with the organization of its employees or to influence or coerce them to join or remain members of any labor organization. Section 2 (Eleventh), upon which the plaintiffs primarily rely, sets forth the union shop provisions of the Railway Labor Act and delineates the limits of union security clauses under collective bargaining agreements between the carrier and union. This section guarantees that where union membership is a condition of employment, membership rights in the union will be equally available to all employees. But TWA's split-system of seniority is not violative of Section 152 (Eleventh) because seniority, while being a condition of employment is not a condition of union membership. See Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Ford Motor Company v. Huffman, *supra.* In fact, plaintiffs admitted at the oral argument that they were requesting the court to extend the present interpretation of Section 2 (Eleventh). Since the circumstances of this case do not warrant construing seniority as a condition of union membership, plaintiffs cannot rely on Section 2 (Eleventh) for equitable relief.

■ The motion of TWA for summary judgment must also be denied. Plaintiffs can proceed on their allegations that TWA acted in concert with the defendants during the 1970 contract negotiations [3] even though plaintiffs probably cannot rely upon Section 2 (Fourth) and certainly cannot rely upon Section 2 (Eleventh).[4]

Plaintiffs contend that TWA and the Union acted collusively, thereby rendering TWA a party to the Union's hostile discrimination and liable for the consequences thereof. In Richardson v. Texas and New Orleans R. R. Co., 242 F.2d 230, 236 (5th Cir. 1957), where a discriminatory practice had been incorporated into a final collective bargaining contract, the court stated:

> It takes two parties to reach an agreement, and both have a legal obligation not to make or enforce an agreement or discriminatory employment practice which they either know, or should know, is unlawful. Unless financial responsibility for a joint breach of such duty is required from both sides of the bargaining table, the statutory policy implied under Steele [Steele v. Louisville & Nashville R. R., *supra*] will be impracticable of enforcement. For the foregoing reasons, we think the Brotherhood's obligation under the statute does not exist in vacuo, unsupported by any commensurate duty on the part of the carrier.

This is not to say that an employer can be held liable whenever he, in any manner, cooperates in the hostile discrimination of an employee. See Carroll v. Brotherhood of R. R. Trainmen, 417 F.2d 1025 (1st Cir. 1969), cert. denied, 397 U.S. 1039, 90 S.Ct. 1359, 25 L.Ed.2d 650 (1970), where "limited employer complicity" did not incur liability.

While the instant case is not directly analogous to the facts of *Richardson* or *Carroll*, the principles of *Richardson* appear to be more applicable. Although TWA's alleged wrongful cooperation is not embodied in a contract provision, the alleged Union misrepresentation and the "sign-off" agreement were a direct result of contract negotiations. Rather than passively cooperating with the Union after the Union had discriminated against an employee, TWA is here charged with being an active agent in effectuating the Union's breach of its duty of fair representation. Without TWA's acquiescence, retroactive system seniority could never have been withheld from the plaintiffs. TWA knew that the Union was the statutory representative of the plaintiffs and owed them a duty to act in good faith and without hostile discrimination. Richardson v. Texas and New Orleans R. R., *supra*. TWA may be found, after a full hearing, to have been a pivotal and indispensable party rendering effective the Union's illegal discriminatory actions.

TWA's motion for summary judgment will be denied. Because of factual issues to be determined, plaintiffs' motion for summary judgment is clearly inappropriate and will likewise be denied.

### IV

Defendants next assert that the action must be dismissed because plaintiffs have failed to exhaust their administrative remedies. The collective bargaining agreement provides a 3-step preliminary grievance procedure (Art. XI) with the System Board of Adjustment for final determination of any disputes (Art. XII). The International constitution provides the Union members with the right to file charges against the Inter-

---

3. The plaintiffs' allegation that both TWA and the Union are guilty of hostile discrimination is found in paragraph 28 of the complaint. Although not completely delineating the conspiracy, the complaint sufficiently alleges that TWA and the Union acted in concert in violating the rights of the plaintiffs.

4. In Carroll v. Brotherhood of R.R. Trainmen, *infra*, it was suggested that employer complicity might constitute "coercion" forbidden by Section 2 (Fourth) of the Railway Labor Act, but this need not be presently decided.

national, District and Local Lodges and their officers for their failure to perform any of their designated duties.

Plaintiff Deboles filed a Step 1 grievance procedure upon receipt of his furlough notice on September 14, 1971. After his Step 1 grievance was denied by TWA, Deboles asked the Union to appeal his grievance to Step 2. Although the request was approved by TWA, it was denied by District Lodge 142. Deboles then filed a written appeal to the president-general chairman of the District Lodge, John Schwind, requesting an extension of time for appealing his grievance from Step 1 to Step 2 to allow review of the grievance committee's decision. John Schwind did not respond to the written appeal.

■ The principles that must be followed in determining whether the plaintiffs must exhaust their administrative remedies have been set forth in Brady v. Trans World Airlines, Inc., *supra,* 401 F.2d at 104.

It has been the general rule, and the rule of this circuit, that before a suit against a union for breach of its duty of fair representation may be brought in the courts, the member must first exhaust the available internal union remedies, *or show an adequate reason for failing to do so.* (footnote omitted). (Emphasis added.)

If a Union member can prove that he failed to exhaust his administrative remedies because such efforts would be wholly futile, he will have demonstrated an adequate reason for failing to pursue available internal remedies. Glover v. St. Louis-San Francisco Ry., *supra,* 393 U.S. at 330, 89 S.Ct. 548, 21 L.Ed.2d 519; Local 4076, United Steelworkers of America v. United Steelworkers of America, AFL–CIO, 338 F.Supp. 1154 (W.D.Pa.1972).

■ After Deboles was denied Step 1 grievance relief, his access to higher stages of the collective bargaining grievance procedure was dependent upon the discretion of his Union officials. The grievance can only be forwarded to Step 2 upon a referral by the shop steward and to Step 3 upon a referral by the president-general chairman of the Union. Access to the System Board of Adjustment is likewise obtained upon a referral by the president-general chairman or the chief operating official of TWA. Under these conditions, the grievance procedure is a closed system in which advancement is totally controlled by the discretionary power of the Union officials. As such, it cannot be expected that Deboles should have or could have proceeded any further with the foregoing grievance mechanism since favorable results were impossible to obtain. See Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Indeed, Deboles did attempt to obtain an extension of time from the general chairman of District Lodge 142, John Schwind, to appeal his grievance, but Deboles never received an answer.

Defendants also contend that Deboles, pursuant to the International constitution, should have exhausted his internal remedies by filing charges of misconduct against the Union and having a trial to determine the merits of his allegations. But before such a trial is commenced, the President appoints a trial committee which decides if the charges contain "sufficient substance to warrant a formal trial." (Art. L, Sec. 5). Although an adverse decision of the trial committee may be appealed to the President and from that point to the Council and then to the Grand Lodge convention or the membership at large, there exists adequate reason on the record why resort was not made to these procedures. After filing the initial charge, the advancement of the complaint under the provisions of the constitution, like the grievance under the collective bargaining contract, is dependent upon the discretion of Union officials. It is only natural

that the defendant should perceive the Union as being unresponsive to his complaints. Since either procedure available to the plaintiff was completely shrouded in the discretionary power of the Union, the actual party against whom the real complaint is made, any further attempt to exhaust his administrative remedies would probably have amounted to an exercise in futility. The defendants are correct in stating that the court in International Ass'n. of Machinists v. Friedman, 102 U.S.App.D.C. 282, 252 F. 2d 846, cert. denied, 357 U.S. 926, 78 S. Ct. 1370, 2 L.Ed.2d 1370 (1958), found the internal appellate procedure of the International fair and adequate. But the instant case is clearly distinguishable from *Friedman*. There the plaintiff alleged that the appellate procedure itself was unfair after he unsuccessfully appealed his expulsion from the Union for encouraging and supporting Communism. In finding that the appellate review was fair, the court in *Friedman* was only concerned with procedural fairness. It was not faced with substantive charges of hostile discrimination against all three levels of the Union hierarchy. While the internal procedure of the International may be fair and adequate in the context of *Friedman*, the instant case presents circumstances which make questionable the substantive fairness of such review procedures.

The nature and extent of the class action has not yet been decided. Because of this, the determination of whether Griffis is a proper party plaintiff or whether the doctrine of exhaustion of remedies applies as to him individually should await the outcome of the determination of the class action.

V

Finally, defendants maintain that plaintiffs' suit is barred by the statute of limitations, the equitable defense of laches, and the time limitations in the collective bargaining contract. The labor agreement requires Union members to protest any errors in seniority listings within fifteen days of the original date of posting. If errors are not protested within the allocated time, the seniority date as it appeared in the posting is deemed official and correct. The collective bargaining agreement also requires the filing of a grievance within thirty days of the date the grievance becomes known to the employee. Defendants argue that plaintiffs never protested the posting of their seniority dates and did not file grievances challenging TWA's split seniority system within the prescribed period of time. Such noncompliance with the time requirements of the collective bargaining agreement, defendants maintain, presents an insurmountable barrier to the continuation of the plaintiff's suit.

Defendants also contend that Pennsylvania's contractual statute of limitations (12 P.S. § 31) will bar plaintiff's action. TWA's split seniority system was originally established by the supplemental collective bargaining agreement of August 24, 1964. It is from this date, defendants argue, that the six-year statute of limitations must begin to run. The defendants then conclude that the statute of limitations had expired by the time plaintiffs had filed their complaint, December 8, 1971.

The thrust of plaintiffs' complaint involves the Union's failure to fairly represent the plaintiffs during the negotiations preceding the collective bargaining agreement of January 28, 1970. Plaintiff additionally alleges that the Union had continually misrepresented between 1966 and 1970 that it was attempting to obtain retroactive system seniority for KSC workers but TWA was arbitrarily refusing to grant such benefits. Under these conditions of alleged unfair representation, the statute of limitations will not begin to run until the alleged wrongdoings have been or

should have been discovered by the plaintiff. Wosche v. Kraning, 353 Pa. 481, 46 A.2d 220 (1946). Since plaintiffs assert that they first became aware of defendants' misrepresentations when they received a copy of the alleged "sign-off" agreement between TWA and the Union at the District Lodge convention in 1970, this action is not barred by the statute of limitations.

The time limitations of the collective bargaining agreement must be examined in concert with the charges of hostile discrimination. The court in Gainey v. Brotherhood of Railway & Steamship Clerks, 177 F.Supp. 421, 426 (E.D.Pa.1959), aff'd 275 F.2d 342 (3rd Cir.), cert. denied, 363 U.S. 811, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960), referring to the same defenses and charges that are present in this case, stated:

> It is recognized that these defenses would prove formidable were the complaint otherwise supportable. In view of the allegations of discrimination and fraud, however, and assertions of the right to injunctive relief against continuing breaches of contract and of trust, this Court is not inclined to make summary disposition of the complaint on that short ground.

Considering the gravity of the allegations in this case, I am likewise reluctant to render summary disposition of the matter on the ground that plaintiffs have not complied with the time requirements of the collective bargaining agreement.

The defense of laches must be decided identically to that of the statute of limitations. If plaintiffs delayed in commencing a suit because they were without knowledge of the fraud or misrepresentation to which they were subject or the wrongful actions had been concealed from the plaintiffs, laches will not bar them in this case from instituting a claim for relief.

Class action determinations required pursuant to Rule 23(c)(1) have not been made. An order providing for a timing schedule for such determination will be made.